CALEB WHITING *v.* DAVID BARNEY and others, ex'rs, &c.

The rule which protects professional communications of clients to their attorneys or counsel, from disclosure, should only be held to extend to such communications as have relation to some suit or other judicial proceeding, either existing or anticipated. Per SELDEN, J.

Where both parties are present, at the time when a communication is made by one of them to his attorney or counsel, there is nothing confidential in the communication.

*Appeal from a judgment of the Supreme Court.*

THIS action was brought to set aside a bond and mortgage as usurious and void. The complaint alleged that on the 25th day of June, 1857, the plaintiff loaned of David Barney, deceased, the defendant's testator, $366. That at the same time said deceased agreed to loan to the plaintiff the full sum of $600, for which the plaintiff, together with his wife, agreed to execute a mortgage upon certain real estate, to secure the plaintiff's bond, which was to be given conditioned to pay a like amount. That as a condition of such loan, it was agreed that said David Barney, deceased, should receive the sum of twelve per cent as interest. That for said $366, the plaintiff gave his note, with sureties. That afterwards, and on the fifth day of November, 1857, said David Barney advanced the further sum of $150, and no more, and thereupon the plaintiff gave the mortgage aforesaid, which is now sought to be set aside. The defendant's answer admitted that David Barney, deceased, lent to the plaintiff $366, June 25th, 1857, and took from him the joint note of the defendant, Samuel Barney, and Miles Abbott. That in October thereafter, said David Barney loaned to the plaintiff the further sum of one hundred and fifty dollars, for which sums the plaintiff proposed, at some time thereafter, to give a mortgage, and take up said securities. That he afterwards applied for a further loan, and that he gave to said David Barney,

deceased, the mortgage mentioned in the complaint, sending it to him by mail, and authorizing him to endorse the balance of principal upon the mortgage, after computing the interest on the said note and money, or to send him the balance in money. That said David Barney did endorse the balance of the principal, after computing the legal interest, and that such balance was $74.07. They denied the usurious agreement charged in the complaint. On the trial, the plaintiff introduced in evidence the testimony of witnesses taken on a former trial, under the following stipulation: "It was stipulated by the parties in open court, that the testimony heretofore taken in this action, as found in the printed case, be used on the trial of this action, except the testimony of the witness, John P. Hulbert, as follows:" It appeared that Hulbert was a practising attorney, residing at Auburn; that he was the general legal adviser of David Barney up to a short period before his death; his adviser in relation to most matters of business; at times both as to his investments and the collection of money; that he occasionally placed demands in Hulbert's hands for collection, and sometimes directed him to look for investments for him, Barney; that Hulbert did about all his law business, and his business pertaining to the completion of loans, &c. That on the 25th of June, 1857, the plaintiff and Barney came to his office together. B. remarked that he and Mr. Whiting (the plaintiff) would like to see Hulbert alone, there being other people in the office, at the time. That the three then went into an adjoining room, and had a conversation on the subject of a proposed loan of money from Barney to the plaintiff, and the terms, amount, condition and manner of effecting the same; Barney and Whiting both speaking on the subject, and addressing their remarks to each other and to Hulbert. The defendants objected to the testimony of Hulbert, taken on the former trial, as to what was said during that conversation, by the parties, on the ground that it was a privileged communication. The court sustained the objec-

tion, and excluded the testimony; and the plaintiff excepted. The judge before whom the cause was tried, found as a fact that the bond and mortgage mentioned and described in the pleadings in this action, were not made, executed and delivered upon the usurious agreement alleged and set forth in the plaintiff's complaint. And as a conclusion of law he found that said bond and mortgage were valid, binding and legal between the parties thereto, their heirs, executors, administrators and assigns, and he decided that the defendants were entitled to judgment for a dismissal of the ·complaint with costs.

Judgment of dismissal being entered, the plaintiff appealed to the general term, which affirmed the judgment.

*S. Giles*, for the appellant.

*N. S. Stephens*, for the respondent.

SELDEN, J. This case presents but the single question whether the conversation between the plaintiff and the defendant's testator, in the presence of Mr. Hurlbert, comes within the rule which protects the professional communitions of clients to their attorneys or counsel. Upon no subject are the decisions more directly conflicting than as to the extent of this privilege. To reconcile them is impossible. It is not difficult, however, to ascertain the source of the conflict, nor, as it seems to me, to determine, with reasonable precision, the true limits of the rule. The cases on the subject may be divided into two classes, and a mere cursory examination will show that the divergence between them grows entirely out of a difference as to the real foundation of the rule.

Its origin seems to have been this: In ancient times parties litigant were in the habit of coming into court and prosecuting or defending their suits in person. Subsequently, however, as law suits multiplied, and the modes of judicial proceeding became more complex and formal,

it became necessary to have these suits conducted by persons skilled in the laws and in the practice of the courts. This necessity gave rise, at an early day, to the class of attorneys. To facilitate the business of the courts, it was important that these men should be employed. But as parties were not then obliged to testify in their own cases, and could not be compelled to disclose facts known only to themselves, they would hesitate to employ professional men and make the necessary disclosures to them, if the facts thus communicated were thus within the reach of their opponent. To encourage the employment of attorneys, therefore, it became indispensible to extend to them the immunity enjoyed by the party.

The most instructive case on this subject with which I have met is that of *Annesley* v. *The Earl of Anglesea*, before the Barons of the Irish Exchequer (17 How. St. Trials, 1139). The case was most extensively and ably argued, and very elaborately considered by the court; and the conclusion arrived at, as to the true origin of the rule in question, may be best stated in the language of Mr. Baron MOUNTENAY, who says, at page 1240: "Mr. Recorder hath very properly mentioned the foundation upon which it hath been held, and is certainly undoubted law that attorneys ought to keep inviolably the secrets of their clients, viz: That an increase of legal business, and the inability of parties to transact that business themselves, made it necessary for them to employ (and, as the law properly expresses it, *ponere in loco suo*) other persons who might transact that business for them. That this necessity introduced with it the necessity of what the law hath very justly established, an inviolable secresy, to be observed by attorneys, in order to render it safe for clients to communicate to their attorneys all proper instructions for the carrying on of those causes which they found themselves under the necessity of entrusting to their care."

To the same effect is the language of Mr. Justice PADDOCK, in the case of *Dixon* v. *Parmelee* (2 Verm. R. 185),

where, in considering this question, he says: "And this distinction seems to give a clue to that which is said to be the origin of the law, which is that, in early days, suitors brought in person their complaints before the king, and afterwards his courts; that, as business increased, the administration of justice approximating to a science, and the necessity of forms sensibly felt, it became absolutely necessary that there should be a set of men to stand in the place of suitors, called attorneys, and manage their causes, *to encourage which,* and bring the same into practice, it also became necessary for courts to adopt a rule by way of pledge to suitors, that their secret and confidential communications to their attorneys should not be drawn from them, either with or without the consent of such attorney."

If this was the true foundation of the rule, it would follow that the protection is confined to communications made with a view to the conduct of a suit, or some judicial proceeding, and it goes most forcibly to confirm and strengthen the direct authority to which I have referred, that in the earlier cases, and while the origin of the rule was most likely to be kept in view, the doctrine would seem to have had this application. The earliest cases to be found on the subject are said to be those of *Berd* v. *Lovelace* (Cary's Rep. 88); *Austin* v. *Vesey* (id. 89); and *Kilway* v. *Kilway* (id. 126), in each of which the witness was excused from testifying, on the ground that he was the solicitor *in the cause.* In another case in the same report, viz: *Denio* v. *Codington* (p. 143), the excuse allowed was that the witness had been of counsel touching *the matter in variance.*

In *Waldron* v. *Ward* (Stiles, 449), the ground of privilege was the same. Sergeant Maynard there proposed to examine a witness as to some matter "whereof he had been made privy as of counsel *in the cause.*" But the chief justice would not permit the examination, saying that the witness was not bound to "disclose the secrets of his client's cause."

So in *Sparks* v. *Middleton* (1 Keble, 505), Mr. Aylet who had been, as the report states, " counsel for the defendant," being called as a witness, was excused from testifying, the Court of King's Bench holding " that he should only reveal such things as he either knew before he was *of counsel*, or that came to his knowledge since, by other persons." Although it is not *in terms* stated, yet the plain inference from the report is, that Mr. Aylet had been counsel *in the cause*. The language used, " counsel for the *defendant*," and " before he was of counsel," would scarcely be otherwise appropriate. · Thus understood, the case holds that communications from his client to Mr. Aylet before the latter was actually employed as counsel *in the cause*, were not protected.

A precisely similar decision was made nine years afterwards, by the same court, in the case of *Curtis* v. *Pickering* (1 Vent. 197.) One Baker, who had been solicitor for Pickering, was called to testify concerning an erasure in a will, supposed to have been made by Pickering. Objection was made that having been *retained* as solicitor, he could not be examined. But the court held that it appearing that Pickering had made the discovery to him " before such time as he *had retained* him," he might be sworn.

It is to be observed in regard to these two cases, that in neither is it said that the communication was not *confidential*, or not made to the witness in consequence of his *professional* character, but the decision is placed upon the sole ground that it was made before the witness was retained *in the cause*.

That the opinion of Lord Hardwicke was in accordance with these cases, is shown by the case of *Vaillant* v. *Dodermead* (2 Atkyns, 524), where the witness demurred to certain interrogatories, on the ground that he knew nothing of the matters enquired about, except what had come to his knowledge as clerk in court. The demurrer was overruled, and the first reason given by Lord Hardwicke was, that it appeared " that the matters enquired after by the

plaintiff's interrogatories were antecedent transactions to the *commencement of the suit*, the knowledge whereof could not come to Mr. Bristow as clerk in court, or solicitor." No notice is taken in this case of any distinction between clerks in courts, and solicitors.

But, to come down to a later period: In the case of *Wadsworth* v. *Hamshaw*, before Chief Justice ABBOTT, (2 Brod. & Bing. 5, in note,) one Hughes, an attorney, being called as a witness by the plaintiff, stated that the defendants "had called upon him to advise them *professionally*, respecting the dissolution of their partnership." The counsel for the defendants objected; but the chief justice, without hearing the counsel on the other side, held "that the communication was not privileged, and that the protection was only extended to those communications with an attorney which related to a cause existing at the time of the communication, or then about to be commenced." He also cited a case tried at the Midland circuit, in which the evidence of the attorney in the cause, called to prove some communication of his client, being rejected, the court upon application granted a new trial; expressly holding "that no *professional* communication was protected, except such as related *to a cause*." This case is important, as giving not only the opinion of Chief Justice ABBOTT, but of the whole court of Kings Bench, in a case involving no other question.

This question came again before the same judge, in the case of *Williams* v. *Mundie*. (1 Ry. & Moo. 31.) The action was assumpsit, for goods sold; and the defendants' attorney being called by the plaintiff, to prove that the defendants were partners when the goods were sold, stated that, "*prior to the commencement of the action* and to the period when the goods were supposed to have been sold, he had been consulted by some of the defendants in relation to a partnership then about to be entered into by them." The evidence was objected to, but the chief justice said: "I think this evidence admissible. The rule I have invariably laid down in cases of this kind is, that what is

communicated for the purpose of bringing an action or suit, or relating to a cause or suit existing at the time of the communication, is confidential and privileged; but what an attorney learns otherwise than for the purpose of a cause or suit, I think he is bound to communicate."

Precisely the same doctrine was laid down by BEST, Ch. J., in the case of *Broad* v. *Pitt* (3 Car. & Pa. 418; 1 Moo. & Mal. 233, S. C.); and, in a note to the case in the latter volume, the true basis of the rule is very justly stated, as follows: "It would seem that the rule is not (as it is often put) founded on a consideration of the importance of the communications made to attorneys, nor on any purpose of protecting the *general* business which attorneys are employed to carry on. The object of the rule appears to be the proper conduct of *judicial investigations*, to which the full and free disclosure of the client, to his professional advisers, is essential."

That Lord KENYON also was of this opinion is shown by his remark in the case of *Duffin* v. *Smith* (Peake N. P. C. 103), that "when any thing is communicated to an attorney by his client for the purpose of *his defense*," he ought not to divulge it.

In a case before the Lord Chief Baron, at the York summer assizes, viz., *Hargreave* v. *Hutchinson*, Lord LYNDHURST said that it had been held by the judges (meaning, I suppose, the twelve judges), *after consideration*, that the rule was that a communication to an attorney is privileged *if an action be pending or contemplated*."

Looking, then, at the authorities thus far noticed, at the doctrine thus enunciated, traced, as it is, to a reasonable and certain origin in the early periods of the common law, we should say that there could be very little doubt as to the true limits of the rule. But unfortunately there is another class of cases still more numerous, which indicate a different doctrine, viz: that the privilege has no special relation to suits in court or judicial proceedings of any kind, but extends to every case where a member of the

legal profession is consulted or employed *professionally.* We must, of necessity, decide which of these two classes of cases we will follow. They are directly antagonistic, and can not both be right.

It is a marked fact, and one of great weight upon this question, that very few of the cases which give the more extended scope to this rule, refer to its origin, or to any principle of policy upon which it is supposed to rest. They seem to assume that it is because the communication *is confidential* that it is protected, and hence great difficulty is experienced in finding any limit to the privilege.

It is said that in one case the court, led, as it would seem, by the idea that the betrayal of confidence had something to do with the rule, would not permit a trustee for the plaintiffs and defendants, who had been employed by them in the purchase of offices, to be examined, and on the ground that he should not be allowed *to betray a trust.* (See 2 Stark. on Evidence, 322.)

In the case of *Wilson* v. *Rastall,* (4 Term R. 753), a leading case on this subject, it was seriously insisted that a confidential communication to a friend, relying upon his secrecy, was protected. Lord Kenyon, in delivering his opinion said : But in order to show that the privilege extends beyond the case of an attorney and client, a hard case has been pressed upon our feelings, of confidence reposed in a friend. But if a friend could not reveal what was imparted to him in confidence, what is to become of many cases affecting life.

This remarkable uncertainty as to the rule, has followed this question into the courts of this country. In *Holmes* v. *Comegys,* (1 Dall. 439), it was contended that communications to a confidential agent or factor, and in *Caps* v. *Robinson,* (2 Wash. C. C. R., 389), those to a *confidential* clerk, were protected.

These cases could never have arisen but for the fact that the courts, whenever they have extended the privilege to communications other than those which related to some

existing or prospective *judicial* proceeding, without taking the trouble to recur to the origin of this rule, have assumed that the idea of a *betrayal* of confidence, or a breach of that obligation which all men recognize, to preserve inviolate a secret confided, lie at its foundation. It is upon this assumption, mainly, if not entirely, that the courts have ever extended the privilege beyond what was necessary to accomplish its original objects, as here set forth, viz: to protect those having business before the courts in the employment of skilled men to transact it. The language of the judges in many of the cases prove that in making their decisions, this idea was prominent in their minds.

The authoritative weight of this class of cases, therefore, depends in a great degree upon the correctness of this assumption. It can hardly require argument to prove that the social obligation, faithfully to guard against revealing that which is communicated in confidence, cannot by possibility, have any logical connection with the rule in question. That obligation relates solely to a *voluntary* disclosure, and can have nothing whatever to do with the policy of the law, in its efforts to ascertain truth, and administer justice. It is dishonorable in one to whom a secret has been confidentially confided, *voluntarily* to reveal it; *therefore*, the law when engaged in ferreting out this very secret, should not *compel* its disclosure. Is this sound reasoning? No one will so pretend, and yet palpable as is the distinction, its disregard through the inadvertence of the courts, has had a great deal to do with the wide departure in the class of cases under consideration, from the rule as originally laid down. I do not mean to say that the courts have deliberately placed their decisions upon this obviously untenable ground, but that their language often shows that the idea of *violation of trust* was prominent in their minds, and influenced their conclusion.

It is strongly corroborative of the view here maintained, that whenever any judge has directed his attention speci-

ally to the origin of the rule, he has in general admitted it to be as here stated. Thus in one of the cases relied upon to support the extended rule, viz: *Greenough* v. *Gaskell* (1 Myl. and Keen, 98), Lord Chancellor Brougham, in the course of a very elaborate opinion, says: "The foundation of this rule is not difficult to discern. It is not (as has sometimes been said), on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection.  *  *  * But it is out of regard to the interests of justice, which cannot be upholden, and to the *administration of justice*, which cannot go on without the aid of men skilled in jurisprudence, *in the practice of the courts*, and in those matters affecting rights and obligations, which form the subject of all *judicial* proceedings."

But notwithstanding this distinct recognition by the chancellor of the true basis of the rule, which if admitted, necessarily admits the privilege to communications having some connection with judicial proceedings, he nevertheless in that very case, allows the protection to cover communications not made in reference to any such proceeding, either past, present or future; the statement of the witness being merely that they "were received by him in his capacity of confidential solicitor for Dannall, for whom he had been *professionally concerned* for a number of years." How such a conclusion could be deduced from a rule founded upon such a reason, I am unable to see; and the learned chancellor would himself, I think, find it difficult satisfactorily to explain. The question was precisely the same as that in the case of *Annesley* v. *The Earl of Anglesea*, *supra*, the opinion of both courts as to the true basis of the rule was the same, and yet the conclusions arrived at were directly opposite. I think very few, upon a critical examination of the two cases, would hesitate to concur with the Irish barons. It may not be improper to say, that Lord Brougham, in recurring to the origin of the rule, was giving history, a matter in respect to which he was rarely

mistaken. His deductions from the rule involved a different mental process.

I will here refer to two other cases, as they seem to me specially worthy of notice, viz: *Mills* v. *Griswold* (1 Root, 383), and *Calkins* v. *Lee* (2 Root, 363). The question in both these cases was whether a witness is obliged to disclose, upon his oath, what the defendant had told him in confidence, and upon a *promise to keep it secret.*

In the first case, the court said: "The distinction is, where the communications are *necessary*, in the course of business, as of a client to his attorney, he may not disclose them. But where the communications are *voluntary*, as in the present case, his oath obliges him to tell the *whole* truth." In the other case it said: "If it is a voluntary communication, and the adverse party is interested in the testimony, the witness must testify."

In these two cases the court, without expending any learning upon the origin or history of the rule, and without being confused by any considerations as to the violation of confidence, and of the solemn promise of the witness not to disclose, with that plain and unerring good sense which has so often distinguished the courts of that state, went at once to the very pith of the rule of exemption. They seem to have seen that it was only because the necessity of employing attorneys to transact the business of courts, in a measure *compelled* the reposing of confidence in them, that communications to them were protected.

There are many other considerations, as well as cases, which if adverted to would throw light upon this subject. But it seems to me that enough has been adduced to make it clear, that the privilege in question is not founded upon any idea of the sacredness of confidential communications, whether made to an attorney or to any other person; nor upon any peculiar policy of the law which distinguishes the *general* business of an attorney from that of any other class in the community; but it was the result of that rule of the common law, which excused parties from testifying in their

own cases, and of the necessity, for the convenience of the public, as well as the benefit of suitors, of having the business of the courts conducted by professional men.

Whether, therefore, the recent legislation in this state, compelling parties to testify as witnesses in their own suits, should be deemed to have removed the whole foundation of the rule, and terminated all necessity for its continuance or not, which may admit of some doubt, it follows from the views here expressed, if correct, that the protection should only be held to extend to such communications as have relation to some suit or other judicial proceeding, either existing or contemplated.

The judgment of the supreme court, at general and specal term, should be reversed, and there should be a new trial, with costs to abide the result.

DENIO, CH. J. and WRIGHT, JOHNSON and MULLIN, J. J., were also for reversal, on the ground that both parties being present, there was nothing confidential in the communication.

INGRAHAM, J.   Upon the question as to the admissibility of the testimony of Hurlbert as to what passed between the plaintiff and Barney in his presence, the decision must depend upon the fact of the attorney being the counsel for both parties.   If he was only the counsel of Barney, then the decisions settle that the disclosures being made in the presence of a third party, they are not privileged. (*Griffith* v. *Davis*, 5 Barn. and Ad. 502; *Shore* v. *Bedford*, 5 Man. and Gran. 271; *Weeks* v. *Argent*, 16 Mees. and Wels. 816.)   In *Coveney* v. *Tannahill* (1 Hill, 33, 40), BRONSON, J. says, in commenting on *Robson* v. *Kemp* (5 Esp. R. 52): "It may have been thought important that the witness had acted as attorney for both parties; for where an attorney is called in by one party to witness a transaction in the way of business with a third person, I cannot think his mouth is closed either to what he saw or heard.   It is not

in the nature of a confidential communication between an attorney and client."

I do not think the witness can be considered in any other light than as the counsel of Barney. He wanted the advice, and the object of consulting the counsel was to ascertain if the arrangement could be made legally, so that he (Barney) could get twelve per cent. on the loan. A part of the transaction was the taking of the note and payment of the money, and leaving the note in the possession of the counsel until it was endorsed and delivered, and the deposit of extra interest was made with the counsel. This was a fact within the knowledge of all the parties, and which, under all the cases, would not be privileged.

This evidence offered was an examination of a witness as taken on a former trial. The stipulation to admit such evidence, expressly excluded the testimony of this witness. There was no ground on which it could have been received, even if the court had ruled that it was not privileged; unless with the consent of the adverse party.

The objection to this evidence when offered, was solely on the ground that it was privileged, and we can only conclude that the other objections were waived, and the parties had agreed to submit the question solely on the points stated on the trial. As the objection was not made in the court below, the defendant cannot now avail himself of those grounds to sustain the exclusion of the evidence.

The judgment should be affirmed.

HOGEBOOM and DAVIES, JJ. were also for affirmance.

Judgment reversed.