STONE *v.* MINTER *et al.*, administrators.

1. When a client makes to his attorney a communication or statement in the presence of the opposite party as to the transaction in hand, it is not confidential or privileged, and the attorney is a competent witness to testify respecting the same on the trial of a case arising out of such transaction, between the administrator of the client and the other party.
2. Parol evidence tending to show that a conveyance of land was really made in extinguishment of a debt and that the grantor, for reasons satisfactory to himself, desired that the grantee should pay over to him, on delivery of the conveyance, the amount of money specified as the consideration, with the promise that if this was done he would repay said sum to the grantee, does not have the effect of varying any of the terms or conditions of the deed. Such evidence goes alone to the point as to what was the true consideration of the instrument, concerning which inquiry always can be made. The court erred in granting a nonsuit.

Argued May 17, — Decided June 6, 1900.

Complaint. Before Judge Hart. Jasper superior court. September term, 1899.

*F. Jordan & Son* and *George & George*, for plaintiff.
*J. D. Kilpatrick*, for defendants.

LITTLE, J. Stone instituted an action against Minter, administratrix, and Minter, administrator, of the estate of William S. Minter, making substantially the following case: The intestate died on July 5, 1897, and at the time of his death was in-

debted to petitioner in the principal sum of twenty-three hundred dollars, besides interest. Said indebtedness arose in the following manner : In June, 1887, the intestate, who was aged, infirm, and had no family, was residing on his farm near where petitioner lives; and at the urgent request of the intestate, he was received as a boarder at the house of petitioner, with the understanding and agreement that he would pay to the wife of petitioner satisfactory compensation for his board, no specific sum being agreed on. In addition to boarding at the house of petitioner, the intestate, in March, 1888, became a lodger at his house, and continued to board and lodge, under the agreement aforesaid, from said respective dates to the time of his death. After he thus became an inmate of petitioner's home, the intestate repeatedly declared that he intended to convey a part of his estate to the wife and children of petitioner, for the kind treatment he had received, and in payment for the board and lodging furnished him. Subsequently, the intestate not having performed any of said promises, petitioner insisted on a settlement of his claim for board. It was then mutually agreed that the sum of twenty-eight hundred dollars would be a fair and reasonable compensation for the board and attention which the intestate had received, which sum the intestate proposed to pay by conveying to petitioner the title to four hundred acres of land which adjoined the premises of petitioner. This proposition was accepted. It was then further proposed by the intestate that, inasmuch as his relatives would be dissatisfied with him and cause a disturbance if the land was conveyed in payment of the debt, the petitioner should pay him $2,300 in cash and execute and deliver to him a promissory note for $500, being the consideration to be mentioned in the deed, and that subsequently he, the intestate, would refund the money and note thus to be given to petitioner. The intestate stated, as a reason for desiring to make this arrangement, that he was old and feeble and did not desire to be worried by his relatives, and that the arrangement proposed by him would be the means of concealing from his relatives the true transaction. Relying on the promise of the intestate to repay him the sum of $2,300, and to return to him his promissory note, petitioner agreed to the proposition, and on June 29, 1896, he paid to the intestate $2,300 in

cash and delivered to him his promissory note for $500, and received a deed from the intestate conveying to him the aforesaid land. Shortly thereafter the intestate did return and deliver to him his note, with the statement that as soon as he was well enough he would go to the bank, procure the money, and return it also to the petitioner. The intestate was prevented from so doing by sickness which terminated in his death.

The answer denied specifically and at length all the allegations in reference to the indebtedness and the contract as set up by petitioner. On the trial of the case, Major John C. Key was introduced as a witness, and testified as follows: "I knew Wm. S. Minter in his lifetime, and I know plaintiff. This deed [referring to a deed handed to him], Wm. S. Minter to Jas. A. Stone, dated January 23rd, 1896, is in my handwriting. I wrote it at the instance and request of Mr. Minter. He and Mr. Stone were present. Mr. Minter said on that occasion, in the presence of Mr. Stone, that he and Mr. Stone had agreed upon the compensation he was to give Stone for his board, lodging, and attention for several years past. He said that he and Stone had been talking a long time about this compensation, and that he had agreed to give Stone that piece of land, and he wanted me to write a deed to it to Stone as a compensation for his having remained and boarded there at Stone's. He said that they had agreed on the price of the land at $2,800, and he was going to make him a deed to that land, that he had been talking about making a will, but he thought that arrangement would not do, that it would involve Stone in some litigation with his, Minter's, kin, after his death. He spoke of Stone having been his friend and confidant, and said that he had, perhaps, created a suspicion among his kindred that he would do more for Stone than for them. He said that Stone had done more for him than any one else had done, and that he did not want Stone to get into such litigation, and he had decided to make him a deed to the land. He said that his people would be asking him about the matter of this deed, and in order that he might have an excuse, and as Stone had the money to pay him the $2,800, he wanted it to appear as if it was a sale, and that he would pay the money back to Stone. He said that was the agreement. I was not present when the $500 note was exe-

cuted by Stone, but in the conversation just related Mr. Minter said he wanted the deed made and he would sign it, and that he and Stone would arrange balance by Stone's handing him $2,300 and his note for $500, and that both money and note were to be returned by him to Stone." On cross-examination, the witness said: "I had been of counsel for both Minter and Stone. In writing this deed I was in his (Minter's) retainer. Q. Who represented Stone in that matter? A. Nobody but himself. Q. Who appealed to you to draw that paper (the deed)? A. Mr. Minter. Q. You didn't represent Stone at all? A. No, sir, I was doing this for Mr. Minter." And also: "A few days before I wrote the deed I heard Mr. Minter and Mr. Stone talking together in my presence about this matter. In that conversation Minter told Stone that he was going to give him that piece of land valued at $2,800, as compensation for his board and the services that Stone had rendered him in taking care of him. He said to Stone that the money that he was to pay him was simply a sham, and fixed so he could say, if he was inquired of about it, that he had got the money from him. He was talking to Stone then." Counsel for defendant objected to this evidence and moved to rule out the same, on the ground that the facts testified to were privileged communications between attorney and client, and therefore inadmissible. The court sustained the motion and ruled out the evidence; to which ruling the plaintiff excepted. The plaintiff then introduced a number of witnesses whose evidence tended to support the allegations of the petition. The plaintiff having closed, defendant moved for the grant of a nonsuit, which was ordered; and to which judgment the plaintiff also excepted.

1. The Civil Code, § 5198, declares that certain admissions and communications are, from public policy, to be excluded as evidence. Among these are communications between attorney or counsel and client. Section 5271 of the same code gives the rule more explicitly. Its provisions are, that "No attorney shall be competent or compellable to testify in any court, . . for or against his client, to any matter or thing, knowledge of which he may have acquired from his client, by virtue of his relation as attorney, or by reason of the anticipated employment of him as attorney, but shall be both competent and com-

pellable to testify, for or against his client, as to any matter or thing, knowledge of which he may have acquired in any other manner." Section 5199 still further enlarges the rule relating to privileged communications, and declares that "Communications to any attorney, or his clerk, to be transmitted to the attorney pending his employment, or in anticipation thereof, shall never be heard by the court." The rules established by these sections of our code are, in their effect, the same as existed at common law, except that under the common-law rule the attorney could not be compelled to testify as to communications, nor to disclose papers or letters, or entries made by him in that capacity, while our statute goes to the extent of declaring that the attorney shall not be competent or compellable to testify for or against his client. Lord Chancellor Brougham declared that the' rule was not founded on any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, but out of regard to the interests of justice which could not be upheld, and to the administration of justice which could not go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in matters affecting rights and obligations which form the subject of judicial proceeding; and that if such communications were not protected, no man would consult a professional adviser with a view to his defense, nor safely go into a court either to obtain redress or to defend himself. 1 Myl. & K. 102; Id. 94, 95. Mr. Greenleaf, in the 1st volume of his Law of Evidence, § 239, says that this privilege is not personal to the attorney, but is a rule of law for the protection of the client. Mr. Weeks, in his Treatise on Attorneys and Counsellors at Law, § 144, gives the general rule established by the weight of authority on this subject as follows: "An attorney is privileged from giving evidence of any confidential communication made to him by his client, or concerning which he has been informed in his professional capacity as attorney for the client. The privilege is that of the client, and not that of the attorney." The same author (§ 151) says, on authority, that the rule does not extend to information acquired by him in any other way than by such confidential communication by the client; and Mr. Best, in his work on the

Principles of Evidence, § 581, says that the privilege does not extend to matters of fact which the attorney knows by any other means than confidential communications with his client, though if he had not been employed as attorney he probably would not have known them.   It appears that Mr. Key was an attorney, that he was employed as such by the deceased at the time the deed was written.   It is thereby established that the relation of client and attorney did exist at the time the deed was executed between Stone and the intestate.

It is, however, contended that, inasmuch as the privilege which the law allowed is for the benefit of the client and not counsel, the rule relates only to confidential communications existing because of such relation; that inasmuch as the communication made by the client to the attorney was in the presence of the other party to the contract, it was not in law such a confidential communication as could not be given in evidence by the attorney.   There seems to be very much force in this contention.   The idea which seems to be involved in the establishment of the rule is not that of mere secrecy.   It is not that the client has imparted to the attorney information about a matter which is to be concealed from the public, but it is founded on altogether a different principle.   Having respect solely to the free and unembarrassed administration of justice, and to the security of all men in the enjoyment of their civil rights, no man is under a legal obligation to disclose facts or circumstances which would render questionable his demand for a particular right, or impair his defense to another's demand.   Originally, suitors and defendants appeared personally before the tribunal which interpreted and administered the law.   Subsequently, however, when the application of legal principles and the forms of procedure became more complicated and intricate, the services of persons having knowledge of the one and skill in the other came into demand, and, to fully protect the rights of parties litigant, the procurement of the services of persons skilled in the law became universal.   No man being compelled to himself disclose the weakness of his case, it followed, almost as a necessary consequence, that the person who represented him and presented that case could not do so.   If it were otherwise, the free administration of justice would be restricted and the ascer-

tainment and enforcement of rights endangered. Therefore when, in order to obtain the measure of his rights, the client resorted to a representative who could better judge the merits of his case, and disclosed to him the facts upon which the ascertainment of his rights must depend, the law of public policy put a seal upon the lips of his counsel just as effectually as the interest of the client placed a ban upon his own disclosure; and, to the credit of the profession be it said, as a rule almost without exception, the private matters of the client communicated to counsel are held sacred. There is no reason why an attorney may not be called as a witness to give evidence of facts within his knowledge. In the administration of justice the courts will compel him so to do, and to place before the jury his knowledge of any fact in issue, except as to those which his client, depending on him for advice and direction, has seen fit to communicate in order to obtain the full measure of his rights. These are deemed confidential in the interest of the client, and privileged for his protection, but when communicated to other persons and when others are allowed the same opportunities of knowledge that the attorney possesses, the confidential relation necessarily does not exist, and the privilege does not attach.

In the present case the communication which was claimed to be privileged was transmitted to the attorney in the presence of the other party to the contract. It is true that by agreement between them the public were not to be informed of their private arrangement, not because such information would add to the strength or increase the weakness of either side. The parties were apparently in full accord. No differences existed between them; and, in order to carry out terms upon which they were fully agreed, the communication was made to the attorney in the presence of both, and the secrecy necessary to be observed did not affect the contract, but was for the purpose of avoiding criticisms and questions of strangers to their agreement. It is the secrets of the client which affect his right that the law does not permit the attorney to divulge, and it seems to be well settled, on authority, that if the communication made by the client to the attorney is in the presence of the other party to the contract, and it comes within his knowledge, such communication is not embraced in the rule which prohibits

that it may be given in evidence by the attorney when called on so to do.   Mr. Weeks, in his Treatise on Attorneys at Law, § 159, declares, as an exception to the general rule which we have stated, that the statements of parties made in the presence of each other may be given in evidence by attorneys, because such statements are not, in their nature, confidential, and can not be regarded as privileged.   Mr. Wharton in his Law of Evidence, § 587, on authority, says, "Privilege, however, has been held not to extend to communications made to counsel in the presence of all the parties to the controversy.   In the case of Brand *v.* Brand, 39 How. Pr. 193, it was ruled that communications to counsel made in the presence of the adverse party are not privileged, and the counsel is a competent witness thereon.   The same ruling is made in Britton *v.* Lorenz, 45 N. Y. 51.   In Hummel *v.* Kistner, 182 Penn. St. 216, it was ruled that, "on a bill in equity to set aside a deed made by a father in his lifetime to his daughter, declarations of the deceased to his attorney while he was writing the deed are not privileged, when made in the presence of both parties to the transaction."   In this connection see also 96 Iowa, 24; 106 Mich. 635; 14 B. Monroe, 417; 30 N. Y. 330.   Our own court seems to have recognized the same rule.   In the case of *Corbett v. Gilbert,* 24 *Ga.* 454, it was ruled that an attorney who is called on to write a bill of sale is not prohibited by the statute from giving evidence of a conversation between the parties in relation to the contract; and in the case of *Brown v. Matthews,* 79 *Ga.* 1, this court, in discussing the statute now under consideration, said: "Furthermore, what is known to both parties is not a confidential secret in a subsequent controversy between them."   See also *Burnside v. Terry,* 51 *Ga.* 186; *O'Brien v. Spalding,* 102 *Ga.* 490, and notes to same case as reported in 66 Am. St. R. 202–213.   We are of the opinion, under the authorities cited above, that the court erred in ruling out the testimony of Major Key.

2. An examination of the opinion of the very able and careful judge who presided in the trial of this case, which accompanies the record, discloses that in his opinion the proof offered to establish the fact of the promise by the intestate to repay the plaintiff the sum of $2,300, paid under the circumstances de-

tailed, was an effort to engraft on the deed a verbal agreement inconsistent with its terms. We do not so understand it. The action which was instituted was in the nature of an action for money had and received, which always lies where another is in possession of money which ex equo et bono ought to be paid to the plaintiff. The deed recites a consideration of $2,800. It is true that the proof submitted tended to show that the true consideration was not $2,800, nor any other amount of money, but was the payment of a debt claimed by the petitioner to be due him by the intestate to the amount of $2,800, and that while the petitioner paid to the intestate $2,800, it was on an agreement that the land was in fact conveyed to pay the debt, and the $2,800 paid to the intestate was to be repaid to the petitioner. Such an agreement in nowise affects the validity of the deed, nor does it change any of its terms. It is true that it shows the consideration to be different from that which is expressed in the deed. The consideration of a deed may be inquired into without affecting the terms of the contract, and whatever was the consideration of the deed, whether it was $2,800, as expressed, or whether it was the payment of a debt of $2,800, really becomes immaterial. Nor do we agree with the suggestion, made in his opinion by the judge, that the evidence shows that the right of action, if any there was, was in the wife of the petitioner and not in him. The suit was not instituted on the original agreement to pay Mrs. Stone for the board of the intestate. It has for its foundation the agreement on the part of the intestate to repay to the petitioner the amount of money which he turned over to the intestate under the agreement alleged. We are not to be understood as passing on the merits of this case, nor deciding as to whether the evidence offered was sufficient to establish the contention of the plaintiff. The questions of fact involved must be determined by the jury. For the reasons which we have given, it is our opinion that the evidence of Major Key was admissible; and we might go further and add that without it the case ought to have been submitted to the jury for determination of the facts. As it is, we think the judge erred in ruling out the evidence of Key, and that he likewise erred in granting a nonsuit. The judgment is, therefore,

*Reversed. All the Justices concurring, except Fish, J., absent.*