HANLEY, ALIAS WHALON, v. STATE OF OHIO.

**1. STATE NOT BOUND TO PROVE A DIVORCE.**

    In a prosecution for bigamy, the state is not bound to prove that the defendant and his first wife were not divorced.

**2. ADMISSION OF LETTERS WRITTEN TO FIRST WIFE.**

    Letters written to his first wife, by a person prosecuted for bigamy, which contain expressions indicating that the marriage relation existed between them, which letters came into the hands of an officer of the law having been voluntarily delivered to him by the woman who claimed to be the first wife of the accused; *held*, that such letters are competent and may be given in evidence as they do not come within the prohibition of section 7284 of our Revised Statutes.

**3. ADMISSION OF AN ALLEGED CERTIFICATE OF MARRIAGE.**

    It is error, prejudicial to the defendant in a case of bigamy, for the court to admit in evidence a certain paper writing purporting to be a certificate of marriage of the defendant with his first wife, but which does not show when it was written or when it was delivered by the person by whom written.

ERROR.

KING, J.

    This is a proceeding in which the judgment of the court of common pleas of Lucas county is sought to be reversed. The plaintiff in error was indicted by the grand jury of this county at its April term, 1896, and the indictment charges that "on the 18th day of April at the city of Rochester, in the county of Monroe, in the state of New York, did marry one Susan McAvoy, and her the said Susan McAvoy, then and there had for his wife, and that the said Thomas E. Whalen, alias William C. Hanley, afterward, and while he was so married to the said Susan McAvoy as aforesaid, to wit: on the 29th day of April, A. D. 1893, and in the county of Lucas, in the state of Ohio, unlawfully did marry and take to wife one Hattie M. Norman, and to her the said Hattie M. Norman then and there was married, the said Thomas E. Whalen, alias William G. Hanley, his former wife being then alive."

    On that indictment Mr. Hanley, as he chooses to be called now, was arraigned, pleaded not guilty, and was tried at the May term and found guilty of the offense charged, and sentenced to the penitentiary for a period of three years.

    It is claimed that conviction was erroneous, and three reasons are assigned: (1) that the court erred in holding that the conviction could be sustained without the state having proved on the trial that the defend-

Hanley, alias Whalon, v. State.

ant and his first wife were not divorced; (2) that the court erred on the trial in the admission of certain letters written, and addressed, and sent by the defendant to his first wife; and (3) that the court erred in admitting a certain paper writing purporting to be a certificate of his marriage with his first wife. I will dispose of these objections in that order.

As to the first point: we do not think the state was bound to prove a divorce. The alleged first wife was present in court, and her existence fully accounted for. We do not think that there is any rule requiring the state to prove that a divorce had not been had. In the first place, that knowledge could not be within the possession of the state, and it would be impossible of proof. If such a fact existed, it was easily within the knowledge of defendant; and the rule is well settled that where a fact is not within the knowledge of the government, or of the state, that they are not to make that out. We do not think, as it is argued here, that the presumption of innocence would override any presumption to the contrary. In the condition of things, the woman being accounted for, her being alive and that admitted or conceded, we do not think then any burden is imposed upon the state to show that the *status* which the law had once established did not continue. If she had been absent or unheard of for any period of time, it is quite likely the burden would devolve upon the state to show that she was alive—especially if she had been absent and unheard of for seven years, when a presumption, of course, would arise that she was dead. But the presumption is that the relation which the law once established would continue until shown to the contrary.

On the trial the court permitted certain letters addressed by defendant to his first wife, whom he married, if he married her at all, under the name of Thomas E. Whalen, to be given in evidence. These letters were addressed to Mrs. Thomas E. Whalen on the envelopes, and were signed by him, and contained expressions indicating that a marriage relation existed between the parties.

They were evidence strongly tending to show the existence of the marriage relation between them. It is claimed that they were not admissible because of the statute which prevents the admission of communications between husband and wife. There are two statutes, one in the criminal, and one in the civil code. It is quite likely the criminal code should govern. They are substantially alike. By section 7284 it is provided, ''Husband or wife shall not testify concerning any communication made by one to the other, or act done to either, in the presence of each other during coverture, unless the communication was made, or act done in the known presence or hearing of a third person competent to be a witness, or unless in case of a personal injury by either the husband or wife to the other; and the rule shall be the same if the marital relation has ceased to exist.'' I should have said that these letters were brought into the court by one George Gilbert, who testified that he held the position of marshal of Sandusky, that the letters had been delivered to him voluntarily by the woman who claimed that she was the first wife of Mr. Whalen.

Were these letters within the prohibition of the statute? We have examined that question and have come to the conclusion that they were not. It is true that there are many authorities holding that they are within the prohibition of the statute; but then there are others of equal respectability which hold that they were not. One of these I will refer to, because it seems to me not only to be in point, but to give some reason

for the decision; it is 20 Kansas, 599. That was a criminal case in which the defendant had written a letter to his wife practically confessing the commission of a very serious and grave offense. The statute in Kansas is not materially different from that in Ohio. It prohibits either the husband or wife from testifying concerning any communication made by one to the other during the marriage, whether called while that relation subsisted or afterwards. The statute omits the phrase, "or acts done by either, in the presence of each other." But both of them, it will be noticed, prohibit the husband or wife, from testifying in a case concerning a communication made by one to the other. The court said in this case, on pages 613 and 614:

"We shall assume that said letter was a confidential communication from the defendant to his wife; that it is what would ordinarily be called a privileged communication, and that it could not have been introduced in evidence in this case or in any other case, by either the husband or the wife, or against either of them, except with the consent of both, so long as the letter remained in the hands or under the control of any agent or representative of either of them. We assume this, however, without desiring to express any opinion upon the subject. And with this assumption, was the said letter wrongfully introduced in evidence? We think not. It would seem that the letter was in the hands and custody of Joseph M. Barney, the prosecuting witness, at the time it was introduced in evidence. It had previously been sent to the post office, and by mail, from the defendant to his wife. Barney received it from the post office, properly directed to the defendant's wife. He delivered it to her, and she, after reading it, returned it to him, and he furnished it to the prosecution to be read in evidence as aforesaid."

And this is substantially like the case at bar. The letters were clearly voluntarily in the possession of Mr. Gilbert at the time they were introduced in evidence.

"It does not appear that either the defendant or his wife had at that time any control over the letter. It is certainly true, that a communication between husband and wife is a privileged communication.

But it is privileged only while it remains within the custody and control of their agents or representatives, and just so far as it remains within the custody and control of themselves or their agents or representatives. A private conversation between husband and wife, who thought that no one overheard them, may be testified to by a concealed listener. This rule only applies as to confidential communications between attorney and client.

And it is said by Mr. Greenleaf, in the edition quoted in the opinion—1 Greenl., 254a.

"It may be mentioned in this place, that though papers and other subjects of evidence may have been illegally taken from the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissability, if they are pertinent to the issue. The court will not take notice how they are obtained, whether lawfully or unlawfully; nor will it form an issue to determine that question."

And the court proceeds:-

" While the civil code provides that neither the husband nor wife shall, as a witness, furnish evidence concerning confidential communications, yet it does not provide that others who may happen to be possessed of such communications shall not do so."

This is clearly in point, and I think covers the question. It is true that when these letters were written they were privileged communications made by the husband to the wife; but the fact that the person made the communication to his wife in writing, rendering it possible for the communication to be preserved, to be used against him legally, if it became necessary, is a fact which he may be presumed to have comprehended when he made that kind of a communication. The statute only provides that the husband or wife shall not testify to communications made by one to the other during the existence of this relation. It does not prevent the introduction of that communication in evidence, nor has that construction generally been put upon the statute. It only prevents these persons from going on the witness stand and divulging it; but if either of these parties divulge these things by giving the written communication to another, or if that communication is disclosed by a robbery of the mails, or otherwise, and it gets into the hands of a third person, and the issue be raised, it is clear that that third person may, if he be a witness in the case, offer that communication.

Third: In the course of the trial the state offered the paper set forth below, first having proved that the writing upon it was in the hand writing of one David Dickey; that at the time when it was alleged in the indictment that this first marriage occurred David Dickey was a clergyman residing in the city of Rochester, and that he resided at that time at No. 3, Center Park, in that city; that he lived there for many years, and that he was at the time of the trial dead. And they also proved by the law of New York that Mr. Dickey, or clergymen like him, were authorized to solemnize marriages. They also offered other statutes, showing that the clergyman, upon the demand of either of the parties, should issue to them a certificate of their marriage, which should set forth certain facts, and that the certificate might be presented to certain officers and there recorded. It was not claimed by the state that any record was ever made of this, and it is not shown that one was not made in the city of Rochester and in that county. No evidence is offered upon the subject.

It is also contended with reference to the certificate, and practically conceded by the state, that it does not contain those requisites which it should contain in order to be subject of record. I will read this certificate:

"This certificate witnesseth that Mr. Thomas Whalen, Rochester, N. Y., and Miss Susan McAvoy, Rochester, N. Y., were, by me, united in marriage at my home in Rochester, N. Y., on the 18th day of April, 1881.

DAVID DICKEY, 3 Center Park, Rochester, N. Y."

Then there are blanks for witnesses. A portion of this which I have read is printed upon this card and a portion is written, and the written part is in the handwriting of David Dickey, as I have said.

It is claimed that it was erroneous on the part of the court to admit that paper in evidence. It is practically conceded that this is not a record. I think a complete answer to the question of record is to say that if it were claimed to be a record, it must be exemplified in some way, and that proof of that would be required. That has been held in the case of *Naegley* v. *State*, 17 O. S., 453, which was a bigamy case, and in which case there was a record offered which the court found to have been attested by the signatures of all the parties who were required to sign and seal it, passing through all the various

steps. The record purported to have been at the town of Seibeldingen, in the Palatinate, in the kingdom of Bavaria; but the court held that it was not admissible because the state had not offered the law in evidence requiring the certificate to be made of record; and for that reason they reversed the verdict of guilty in that case.

Some cases are cited in New York, showing that a paper like this would not be admissible as a record, or as an official certificate of this marriage. I am inclined to think that those authorities sustain that statement, but I need not read any further, because the 17th O. S. settles the question as to its being admissible as a record.

Now then, it becomes the writing of an individual holding an official position, authorized by law to do such an act which it is alleged occurred in 1881, 15 years ago. This certificate is not dated, and it will be observed that there is no evidence in the record showing when it was written, or when it came from the hands of the person who wrote it, or when or how it came into the possession of the alleged first wife. It is not entitled to admission as evidence on the ground that it is an ancient document, for it is not ancient. So, then, it must be admissible, if admissible at all, as it seems to me, and as it seems to the court, as a part of the *res gestae:* that it was an act concurrent with the act of marriage, and, as held in some of the cases as having been delivered perhaps, in the presence of the defendant. That is one of the grounds upon which such papers are admitted. But no evidence is offered to show when it was written; and that is a material circumstance to be taken into consideration. The proof shows that this clergyman resided in Rochester from 1860 until the time of his death, which was some years after this marriage; I don't remember the date, but before the trial of this case.

We have examined upon this subject every authority which we could find, and read all of the cases carefully, and while I have the books before me, I shall only refer briefly to two or three of the cases cited.

The case which is relied upon by the plaintiff in error is the case of *People* v. *Lambert*, 5 Mich., 349, where it was held that a paper purporting to be a certificate under such circumstances as this would not be admissible in evidence. There were some respects in which that certificate varied from this. The court say:

"A certificate merely signed by the minister, while it may perhaps avail in civil proceedings, if properly supported, cannot avail in criminal trials, where the defendant is entitled to confront the witnesses. And this certificate is entitled to no credit for other reasons. It bears no date, and does not either declare where the marriage took place, or show where the minister resided. It does not show, therefore, that he acted within his jurisdiction, or that the marriage took place as charged in the indictment, in New Jersey. And it does not appear to have been made at or near the time of the marriage."

That it bears no date, and that it does not appear to have been made at or near the time of the marriage, is true of the case at bar.

It is said this is a very old case, and that it is not sustained by the late authorities; but the case cited to us by the attorney for the state, which has not yet gone into the volumes of the Michigan reports—67 N. W. Rep., 821—distinctly refers to that case, and recognizes the doctrine there stated, and I think fairly approves of it. In that case it was held that a certificate of marriage like that one was admissible, be-

cause—the defendant being charged with the commission of adultery—the husband of the woman was called as a witness, and he testified to his marriage with the woman as his wife, and in connection with his testimony was introduced the certificate in question,. The court admitted it, and held that it was properly admissible, because there was proof of the fact of the marriage; and they held that the husband was a competent witness—that is, the husband of the woman who was charged with being *in pari delicto*. They say:

"In the case of *People* v. *Lambert*, 5 Mich., 349, it was held in a case of bigamy that the first marriage could not be established by the confession of the defendant alone, and that the marriage certificate was not admissible to prove it. The marriage certificate mentioned in that case was a foreign certificate, and there were several objections to its admissibility. The admissibility of marriage certificates generally, where accompanied by proof of the identity of the parties, is recognized in the case of *People* v. *Broughton*, 49 Mich., 339, and cases cited."

I only refer to that case because it has been said the case in 5 Mich. is antiquated.

In a case in 114 N. C. the court came to the same conclusion on another certificate. In this case it was the certificate of a rabbi of the city of Riga; and this was also an adultery case, in which Sarah Behrman testified that she was married to the defendant, Behrman, in Riga by a rabbi on the 25th of December, 1884; that the certificate was given by the court, and was signed by the rabbi who married her. He put his stamp upon it she carried it back to the court, and it was there stamped by the court and signed on the day named. The court say in passing upon that:

"The appended writing is but the extra official statement of a private person. At an early period of our national history it was held that the record of a foreign court could not be authenticated by the signature of even an American consul resident in such country, and subsequently a statute was passed which empowered and made it the duty of a consul of this government to keep a record of marriages celebrated in his presence and send copies to a specified office in this country. If the paper offered is not competent because not properly authenticated, as an official record it was not admissible at all as documentary evidence of the marriage, because as was said in *People* v. *Lambert, supra*, a certificate merely signed by a minister, while perhaps it may avail in civil proceedings if properly supported cannot avail in criminal cases, where the defendant is entitled to confront his witnesses.

"The defendant was accused of an infamous crime, and in such cases it was said by Pearson, C. J., in *State* v. *Thomas*, 64 N. C., 76, that the word 'confront' was intended not simply to secure to the defendant 'the privilege of examining witnesses in his behalf,' but was 'in affirmance of the rule of common law that in trials by jury the witness must be present before the jury and accused, so that he may be confronted that is, put face to face.'"

Again: "But while the paper was not admissible as a record or an independent declaration of the rabbi, we think it was made pertinent and competent evidence, even in a criminal prosecution, by the testimony of the witness that it was given to her at the very time of the marriage. While the certificate thus given may tend, when admitted, to support the testimony of the witness to the fact of the marriage, it is competent only as a part of the *res gestae*, being a declaration made

in the presence of the defendant and accompanying the act of solemnizing the rite, if it did not constitute a part of the ceremony.''

And in Maine is another case—78 Me., 204 and 209—in which the court say that such a certificate is admissible in civil cases. In the case before the court there was a question as to the admissibility of such a certificate, or, in case of its loss, oral evidence of its contents. But the court say:

''It being a settled rule of law that marriage may be proved in civil cases, other than actions for seduction, by reputation, declarations, and conduct of the parties, a paper found in the possession of one of the parties to the alleged marriage, or produced by such party purporting to be a marriage certificate, is admissible upon the ground that such a possession or such a production of it is equivalent to a declaration of such party that the facts stated in the certificate are true.''

I cite 11 Mass., 92; 1 Cush., 391; 43 Vt., 20; 32 Pa. St., 511; 2 Canada, Q. B., 77-80, in which we have substantially the same doctrine laid down. But there is another case that I think important in this connection, to which I desire to refer here, and that is *Gaines* v. *Relf*, decided in the supreme court of the United States, reported in 12 Howard, 472. In that case—which will occur to most people as being the famous case of Myra Clark Gaines—it became necessary to prove the marriage of certain persons; and a certificate from the state of New York was offered in evidence. It was in Latin, but it purported to set out, when translated, that certain parties named were, in July, 1790, united in marriage at a certain church, by William V. O'Brien, pastor of St. Peter's church, and it was signed in Latin "Gulielmus V. O'Brien," and evidence was given to show that Mr. O'Brien was pastor of that church, and had been, both before and after the date of the certificate given—from 1784 to 1814—the certificate being dated in 1790. And considerable evidence was offered that that was his handwriting, and that he was accustomed to write his name "Gulielmus V. O'Brien," and that he was accustomed to write all such certificates in Latin. It was also proved that no record of that marriage could be found in the church. So that it brought the case as fully proved as the certificate in this case. The supreme court of the United States, in passing upon that, first refer to some discrepancies in the certificate as to the names of the persons who were said to have been married, and then say:

''But waiving all these objections, and still we think this certificate mere hearsay evidence, and that of a very dangerous character, and this for several reasons. It was given sixteen years after the marriage purports to have taken place, and might just as well have been given, had the priest been alive, 40 years after the marriage, and on the eve of the trial.

''In England, by the statute law, copies from parish registers are received to prove marriages; but the paper produced must be a sworn copy of the parish register, and not a certificate of the officiating clergyman; nor will a copy of a foreign register be received in evidence, on proof that it is a true copy.

''If it were allowable in this country to give such certificate in evidence, where every clergyman of all denominations can perform the ceremony of marriage, and where it is performed by justices of the peace in many of the states, it would open a door to frauds that could not be guarded against.

"And then again, certificates of marriage might be produced by those coming to this country from Europe; for no reason exists why a priest in any part of the world should not have accorded to his certificate all the credence that ought to be given to the one here produced, as Louisiana and New York were foreign to each other in 1790."

There was a certificate as strong as the one here in question, which the supreme court very emphatically say would be dangerous to admit in evidence. It is true that this was not written 16 years after the date of the alleged marriage; but the record is absolutely silent as to when it was written. So that the reason stated by the supreme court in the Gaines case is tenable against this certificate; and it becomes a dominant objection, that the very ground upon which these paper writings have been admitted in evidence in any case is that the proof shows that the writing and the delivery of the certificate was an act concurrent with the performance of the marriage ceremony. We have therefore come to the conclusion, after this review of the authorities, that this certificate, ought not to have been admitted in evidence in this case.

We think the authorities lead irresistably to that conclusion. It is nothing but the writing of a man, with no proof when it was made or when it was delivered. If he had written it in a letter upon his death-bed, and left it, it would have been as competent as this certificate.

It will be presumed that the admission of any incompetent evidence was prejudicial to the defendant. For the admission of this certificate, the verdict and judgment in this case will be set aside, and a new trial awarded to this defendant.

*Marshall & Fraser and J. K. Hamilton,* for Plaintiff in Error.

*J. A. Barber, prosecuting attorney,* for Defendant in Error.