## THE STATE OF KANSAS v. MARION BUFFINGTON.

1. EVIDENCE IN CRIMINAL CASE; *Letter Written by Defendant.* In a criminal prosecution, where a letter, previously written and sent by the defendant to his wife, is not in the custody or control of either the defendant or his wife, nor in the custody or control of any agent or representative of either, but is in the custody and control of a third person, who is the prosecuting witness in the case, such letter may be used as evidence in the case by the prosecution against the defendant.

2. SIGNING AND FILING INSTRUCTIONS; *When Omission Not Fatal Error.* In a criminal prosecution, where the court charges the jury in writing but inadvertently fails at the time to sign some of the instructions embodied in the charge, and to file the same among the papers in the case, but puts them in a safe place, and fifteen days afterward produces them for the defendant to copy into a bill of exceptions, and the defendant so copies them into such bill of exceptions, and the bill is then allowed and signed by the judge, and is duly filed, and the defendant then brings the case with said bill of exceptions to this court, *held,* that although it was error for the court to neglect for fifteen days to file said instructions among the papers of the case, yet, that neither that neglect, nor the failure of the judge to sign such instructions for that length of time, under the circumstances of this case, was either a material or fatal error.

3. ———— Other questions mentioned, and held not to be properly presented by the record for consideration.

### *Appeal from Neosho District Court.*

INFORMATION, charging that defendant *Buffington,* at the county of Neosho, on the first day of November 1877, "willfully, unlawfully, and feloniously defiled one Emily B., a female person under the age of eighteen years, by carnally knowing her the said Emily, she the said Emily being then and there under the care and control of said defendant, she having been confided to his care and protection by her parents." Plea, not guilty. Trial at April Term 1878. The

record shows that *Buffington* was brother-in-law of Emily B. He lived with his wife in the house and with the family of Emily's father. *Buffington*, and his wife, and Frank and Lizzie (a brother and sister of defendant's wife,) were going to the woods to gather plums. Emily wanted to go along. Her mother objected. *Buffington* then requested Mrs. B. to let Emily go along, saying that he "would take good care of her." The mother then consented. Mr. B., Emily's father, was present when such request was made and such consent was given. They all went to the woods together, the defendant and his wife, and Frank, Lizzie, and Emily. When they reached the woods, defendant suggested that he and Emily go alone together, to a place some distance from the rest of the party. They did so, and while thus absent the alleged crime was committed. The commission of the crime was discovered soon afterward, and upon being charged with it *Buffington* left the state. On his way, he wrote a letter from Fort Scott, to his wife. She knew of the charge, and had furnished him the means with which to go away. The letter to her contains a confession by defendant that he had committed some grievous offense, without specifically naming it; is full of expressions of the deepest remorse; makes explanations concerning the means and money she had furnished him; gives information as to points in Missouri where he will call for mail; states his destination to be Sedalia, Mo., and contains plans concerning his removal to Ottumwa, Iowa. This letter was offered in evidence by the prosecution, and received against the defendant's objection. Other facts appearing in the record are stated in briefs of counsel, and in the subjoined opinion. The jury returned a verdict of guilty, and defendant was sentenced to imprisonment in the penitentiary for the term of ten years. From this judgment of conviction he now appeals to this court.

*R. D. Hartshorne*, and *L. Stillwell*, for appellant:

1. The court erred in permitting the letter from defendant to his wife to be introduced in evidence. The letter on its face showed that it was a communication from defendant to

his wife, and it was the duty of the court, on its own motion, to exclude it. (40 Cal. 284.) Had this been a civil action against defendant, and this letter had been offered in evidence, there could be no question as to its incompetency. (Ch. 165, Laws of 1872.) But it will probably be contended that a different rule prevails in criminal cases, as the criminal code as amended makes the defendant and his wife competent witnesses, at their option, in criminal cases, and that they are therefore witnesses for *all purposes*, and consequently that they can testify at length as to communications, either oral or written, made by one to the other. We submit that such cannot be the law. The legislature, in enacting § 215 of the criminal code, as amended, did so with the knowledge that the competency of the testimony of husband and wife was regulated by other statutes and by judicial decisions, and they simply intended to make the husband and wife competent *witnesses* as to *competent testimony*. A different construction will involve us in absurdities. Said § 215 makes no exception for communications between client and attorney; and if counsel for the state are right in the construction they give said section, what is there to prevent the state from interrogating a defendant in a criminal case concerning communications made by him to his attorney? This court has expressly decided in the White case that that cannot be done; (19 Kas. 445.) It is true, that the court in the White case decides that White had not testified to anything in his direct examination that justified a cross-examination touching communications with his attorney; but the court also meets and decides the important question in the case, that communications between a client and his attorney are privileged, and the client cannot be compelled to disclose them. Section 215 makes no mention of such communications, for it, in terms, does not except anything as privileged, so it is evident, from the decision in the White case, that resort must be had to other provisions of the statutes in determining what testimony is admissible from parties made competent witnesses by said section. There is no ground, then, for saying that

39—20 KAS.

§ 215 of the criminal code is not subject to the provisions of § 323 of the civil code. Section 209 of the criminal code expressly refers us to the civil code for the law relative to the "*testimony* of witnesses, their examination," etc.; and how can it be contended that resort can be had to § 323 for protecting communications from client to attorney, but that it is to be ignored and disregarded when invoked to prevent the disclosure of communications from husband to wife. There can be no question as to the act of 1871 operating as a repeal by implication of any existing laws, because in 1872 the legislature reënacted § 323 of the civil code and materially enlarged its scope. Counsel for the state will probably concede, that while defendant's wife could not have been *required* to produce the letter as against her husband, yet will say that if she produced it voluntarily, and without judicial coercion, the letter was competent under § 215. There is nothing in the record to uphold an argument based on such an assumption. In fact, there is nothing in the record that shows that the wife of defendant even testified at all; and as regards the letter, the record states, "that said Ida M. Buffington, wife of defendant, opened said letter and read it, and then, without the knowledge or consent of said defendant, delivered the same to said prosecuting witness, who now produces it in court." So, if § 215 is to be construed in the manner counsel for the state claim, ought not the record to show that the wife of the defendant voluntarily produced this letter in court, and consented to its being introduced in evidence against her husband?

Counsel, however, argued successfully in the court below that conceding this letter to be a communication from the defendant to his wife, yet, it having passed out of the possession of the wife, had thereby lost its privileged character, and was admissible in evidence. Such a construction of the statute as that would be setting a premium upon the theft of a man's private letters to his wife. If the test of the inadmissibility in evidence of a husband's letter to his wife is the vigilance or ability of the husband to follow the letter up, and

prevent its being stolen *in transitu*, or after its reception, or purloined by artifice, or fraud, then we certainly have a principle in the law of evidence that has the merit of novelty.

The case of a letter is not similar to the case of a conversation between husband and wife which a third person has overheard. If husband and wife carry on a conversation in such a manner that a third person overhear it, there may be reason for saying that such third person should be allowed to testify to the conversation, as he certainly would be divulging no confidential communication to himself in so doing. But this letter was not a matter which could reach the *ear*, but only the eye, and the only eyes that had any right to see the contents of that letter, after the defendant mailed it, were those of his wife. And we submit that she could no more give that letter to the prosecuting witness, and have him produce it in court, than she could go on the stand herself, and produce the letter, identify it, and hand it to the county attorney, to be read as evidence. If the confidential character of a written communication between husband and wife can be removed by the act of one of the parties alone, then the statute rests on a very precarious and uncertain base. We submit, however, that in all cases of communications between husband and wife, the right to have them held as sacred and confidential is a *mutual* right, and it is not in the power of either one of the parties to terminate that right against the will of the other. To say that all the one or the other has to do, is, to surrender the letter to a third party, and its confidential character is at once destroyed, would be simply a very shallow attempt to evade the law, and accomplish a thing indirectly which the law says shall not be done directly. That this letter was improperly admitted in evidence, we refer to 9 Kas. 112; 1 Greenl. Ev., § 254; 1 Wharton's Ev., §§ 430, 431, 478.

2. The court erred in the instructions given the jury, and in refusing those asked by defendant. The court seemingly summed up the whole matter, and told the jury that if they believed the things stated in the first instruction, then

the defendant was guilty, and they should return a verdict accordingly. We submit, that where it is attempted to compress the defendant's guilt in one sentence, as was done in this instruction, all the ingredients that go to make up guilt should be stated. There is no allusion in this instruction to the *venue* of the alleged crime, and the significance of that is more apparent in view of the fact that there is nothing in the record tending to show that the alleged offense was committee in the venue stated. The information having charged that Emily was committed to the care and protection of the defendant by her father and mother, and the evidence showing that the father had not acted in the business at all, the defendant asked for an instruction to the effect in substance that if the father took no parental action in the matter, and if the defendant had made no request to him to confide the girl to his care, the jury should acquit. The court refused to so instruct the jury, but did instruct them that "it will be *presumed*, in the absence of testimony to the contrary, that the consent of one parent, where the control of the child is equally in both, is the consent of both." We respectfully submit that the trial court erred in this instruction. In a criminal case, the law *presumes* nothing against a defendant, and every essential fact charged in the information must be *proved* by evidence. (3 Kas. 486, 487.) The jury might have been told that they could infer consent from the circumstances of the case, "but no power but the jury had the right to make this inference;" and for the court to foreclose their right by the above instruction was surely contrary to law.

3. The fourth instruction was erroneous. It contains a mistaken assumption of fact, viz., that the "defendant fled from the country." On the contrary, the record shows that defendant's wife furnished him money to go away with, and that the prosecuting witness argued the question of going away with the defendant, and sought to hold out inducements to bring that about. Also, the letter of defendant introduced in evidence, both in the fact of its being written,

and its contents, is directly the opposite of the act of a fugitive from justice. The defendant had the right to have that matter go to the jury as an open question; yet this instruction prevented that, as this alleged fleeing from the country, and other supposed short-comings of the defendant, are spoken of by the court in said instruction as "facts." Of course, we could not argue to the jury that the defendant had not fled to escape justice, when counsel for the state could follow us and read from the instructions of the court where such fleeing was judicially mentioned as a "fact." But the assumptions do not end there. In the same clause the court said, "such facts may be considered by the jury upon the question of defendant's *guilt*"—thus mentioning the "guilt" of the defendant as an ordinary matter of course, and one so perfectly well established that the use of a modifying word, such as "alleged," before "guilt," was quite an unnecessary precaution. We submit that these assumptions were fatally erroneous. 1 Kas. 74.

4. The defendant surely had the right to have the instruction given to the jury, that, "If the girl Emily was in the care, or under the protection of her sisters and brother, she could not have been confided solely to the care or protection of the defendant." The existence of the one would have negatived the other.

5. The offense charged in the information included an "attempt" to commit said offense, as specified in § 283 of the crimes act, and it was the duty of the court to instruct the jury upon the law regulating such attempts. (3 Kas. 485.) This was not done. In view of the evidence of the injured party, respecting the condition of her clothing at the time of the alleged defilement, an instruction upon the inferior grade of the offense would have been very appropriate.

6. We further submit that the facts of this case do not bring it within the scope of § 233 of the crimes act. The case of *The State v. Jones*, 16 Kas. 608, involves as liberal a construction of said section in behalf of the state as the law will justify, and that is a far stronger case for the state than

this.   In Jones's case, the evidence showed a ·premeditated scheme and design by him to get the girl into his power, and he successfully carried out his scheme by the use of deceit and falsehood.   He carried the girl away from her parents, and took her to his own house under the pretense that he was going to hire her to work in his family.   Under that .state of facts, this court held that the parents of the girl had reposed in Jones the trust contemplated by the statute.   In the case at bar, there was no evidence of any scheme or design, or deceit, or fraud.   The defendant and his wife, and·Frank and Lizzie, were going to the woods to gather plums.   Emily wanted to go, and one of her sisters was the first one that asked Mrs. Barney to let Emily go along.   Mrs. B. declined to let her go, and shortly after .the defendant made the same request, saying he would take care of her, and thereupon Mrs. B. consented to Emily's going.   Upon those facts the court below instructed the jury that the girl was confided to the care and protection of the defendant, within the meaning of the statute.   It seems to us that the true construction of this statute, and one which is every way consistent with the Jones case, is, that the defendant must virtually stand *in loco parentis;* that the physical control of the child, or the right to exercise authority over her, for the time being must have been vested in the defendant.   Parents probably never' let a female child accompany a male, who is her senior, anywhere, without "confiding" the child to the "care" or "protection" of the male.   That the confidence may be slight, or may be great, does not alter the case; it is a confidence' that "he will take care of her."   It must be conceded, then, that the statute will not include every imaginable case of· care or protection that will readily suggest themselves.   The line must be drawn somewhere.   The fact that guardians are the only class of persons specifically mentioned in said section as liable to its penalties, would indicate that the legislative intention was to make only such persons amenable as occupied positions of legal or physical control, or both, over the person of the child.

7. We do earnestly insist that the action of the court below in failing to sign and file with the papers in the case a large portion of the instructions, is an irregularity of so grave and startling a character as will constrain this court to reverse the judgment. The law has thrown many safeguards around the citizen on trial for an offense involving his life or liberty, *certainty* in what is done, and *publicity* in the doing of it, being the most prominent features. To sanction omissions and failures of duty, as shown by the record on the part of the court below in regard to the said instructions, would be establishing a most dangerous precedent. It would be an entering wedge whereby the rights of defendants in criminal cases would be frittered away.

*T. W. Cogswell,* and *Hutchings & Denison,* for The State:

1. The letter written by defendant to his wife, was competent evidence, and was properly admitted. It was immaterial how the prosecution became possessed of this letter. Even if it was abstracted from the mails, or otherwise obtained illegally, its admissibility was not affected. 1 Greenl. Ev., §§ 229, 254a. When this letter was offered, the defendant objected to it, " that it was a communication from him to his wife, written during the existence of the marriage relation." This was the only objection made. It does not appear from the record when or under what circumstances this letter was offered in evidence; or what evidence preceded it; whether it was offered by the state in its opening case, or in rebuttal; whether before, or after, defendant and his wife had testified; whether to impeach the defendant and his wife, or in connection with her testimony as a witness for the state. The record brought here seems to have been framed to keep out of view as much of the case as possible, under the assumption that what the record failed to show this court would presume against the trial court; and counsel seem to boast that their record does not show whether defendant's wife testified as a witness or not, and says, "Ought not the record to show that the wife of defendant voluntarily produced this

letter," etc.  With reference to this record, and what it should
show, we have never had any choice or control.  The de-
fendant could preserve such parts of the proceedings and evi-
dence as he pleased.  It was not in our power to dictate what
bills of exceptions he would take, or what they should con-
tain.  But when he seeks to reverse the judgment below for.
error, we understand that he assumes the burden of making
the error affirmatively appear; that all presumptions are in
favor of the correctness of the rulings of the trial court;
hence, insomuch as the record does not show when, under
what circumstances, or in what connection, the letter was in-
troduced, if the voluntary production of it by defendant's
wife, or the introduction of it in support of or in contradic-
tion of her testimony would make it competent, this court
will presume that it was admitted under such circumstances
as made it competent, and proper to receive it, and defendant
can gain nothing by criticising his own record.

Under our view, the letter was proper evidence as an ad-
mission of the defendant.  The letter was in possession of
the state, and it makes no difference how the state obtained
it.  Of course, preliminary proof that it was in defendant's
handwriting had been made.  We do not go to the common
law, but to the statute, for the rule relating to communica-
tions between husband and wife.  The *communication* itself
is not privileged, but merely the husband and wife shall not
"be permitted to testify concerning it;" (ch. 165, laws of
1872, p. 334;) that is, the *witnesses* are privileged, not the
*matter*.  The very language of the statute implies that others
may testify concerning such communications.  If the com-
munication itself was privileged, it would have been idle to
prohibit husband and wife from testifying concerning it, as
neither they nor any one else could so testify.  If the com-
munication between husband and wife is overheard, or can
be produced without calling either of them to testify concern-
ing it, it is competent, and has been so held by the highest
courts.  (35 Vt. 379; 1 Whar. Cr. Law, § 767.)  But even
if this were not so, ch. 118, laws of 1871, p. 280, puts the

question beyond controversy. This enactment makes an independent rule for criminal cases; it removes, so to speak, the disabilities heretofore resting upon husband and wife as witnesses for and against each other, and of course the effect is, to give full play to all the tests applied to other witnesses to arrive at the truth. A few illustrations: The defendant and his wife were both witnesses in this case. Now suppose the defendant upon the stand denied the commission of the offense; denied that he fled when accused; denied that his wife furnished him means to make his flight; denied that he was ever in Fort Scott; denied that he went to Sedalia; denied writing this letter; and denied that he wished himself dead: suppose he brings his wife upon the stand, and she corroborates him in every respect: must the prosecution, with this letter in its possession, allow these falsehoods to prevail? Was it the object of this statute to remove all disabilities from husband and wife as witnesses, and yet prevent all means of impeaching them or testing their veracity? Suppose it became vital and necessary in a criminal case for the defendant to show that he knew a certain fact at a certain time; and such fact was communicated to him by a letter from his wife; or suppose it was important for him to show that he communicated a fact to his wife by letter: it would hardly be contended, that either the letters or the testimony if offered *in his favor*, could be excluded, since the act of 1871, making husband and wife competent witnesses for each other. Yet it is contended in this case, that the same letters, if offered *against* defendant, must be excluded, even if voluntarily brought in by the wife and used to corroborate her testimony. It is a general rule, that whenever husband and wife would be competent as witnesses for each other, they are also competent witnesses against each other. 1 Wharton's Cr. Law, § 770, and notes.

2. The instructions in this case, upon the evidence given, are all borne out by the case of *The State v. Jones*, 16 Kas. 608. This case is stronger than that, even upon the partial and favorable statement of it contained in appellant's bill of

exceptions.    Let us briefly recapitulate: Appellant was brother-in-law of the girl Emily; he lived with his wife in the house and family of Emily's father.    Under a promise to take good care of her, he induced Emily's mother to let her go to the woods with him to gather plums, and while with him, under these circumstances, he defiled her.    She was under 18 years of age; (just what her age was, nowhere appears in the record.)    This was proved by the clearest and most satisfactory evidence.    His own testimony, with that of his wife, would have convicted him before any jury.    Let us examine some of the circumstances: Appellant and Emily went with *others;* when they got to the woods *he* suggested that he and Emily go *alone* together.    Soon after appellant made certain admissions tending to show his guilt, and said he was a wicked wretch and ought to be shot, and would shoot himself.    He then left the state, and in his flight wrote back a letter admitting his guilt.    After being arrested, he said that it would do no good to send him to the penitentiary, and offered to pay $1,700, besides all the costs, and leave the country if the prosecution was dismissed.    Now, this is only *one side* of the testimony actually given, and this makes the strongest kind of a case.    The statute under which the conviction was had, and the construction of it in Jones's case, has been criticised to some extent, but cases like this one show the wisdom, both of the statute and its construction. Without this statute there would have been no punishment for the revolting crime of Buffington.    It was intended to reach cases where the ruin of young girls has been accomplished, through the influence that the relation of confidence gave the seducer, whose duty it was to protect, instead of destroy.    The sheep were safer unguarded, when the shepherd turns robber.

3. This first instruction is undoubtedly correct.    If it is at fault in any respect, it is in omitting a qualification concerning time, and venue.    There was no conflict upon either of these questions in the evidence.    All the witnesses for the state, and the defendant himself, testified that the acts which

it is claimed constituted the offense occurred on November 1st 1877, at Mr. Barney's farm in Neosho county, Kansas. Where all the witnesses agree as to a fact, and there is no dispute or controversy concerning it in the evidence, we suppose the court may treat it as a fact. The defendant could not have been prejudiced by assuming that his own testimony was true. But the court elsewhere instructed fully and explicitly upon both the questions of time, and venue, advising the jury that the state must prove both beyond a reasonable doubt.

4. The instruction concerning the act of the parents in confiding Emily to defendant's protection is unobjectionable; at least, if there is any error, it is in favor of the defendant. As has been said, only a portion of the evidence is pretended to have been brought here, and on this question great light could be gained by referring to evidence not in the record. The evidence did show that the father was present, and by his silence consented and acquiesced in Emily's going with defendant when he promised her mother that he would take care of her. But in our judgment it was not necessary that there should have been any joint action of the parents. It would have made no difference if one of the parents had been absent, divorced, or had abandoned the other, or even had objected in terms at the time to committing the girl to defendant's care. After having been confided to his care, at his own request, by the mother, under a promise that he would take care of her, it does not lie in his mouth to say that he could defile her because he had not also promised the father. The authority of the parents over the child is concurrent, so to speak, and the act of one is the act of both.

5. The fourth instruction is complained of. Here again the evidence is not all in the record. The evidence did show that upon being accused by one of the neighbors, defendant precipitately fled, and that he was overtaken in Missouri and brought back. And the *record* does show that upon being accused he fled. The criticism on the words "facts," "guilt," and "alleged," are frivolous, and overlook entirely the con-

nection in which the words "fact" and "guilt" were used, and the qualifying language. The word "alleged," is not the only qualifying word in the language, and it is quite possible to write a good instruction without using it. Where all the testimony on both sides is harmonious concerning an act, or event, the court may treat or speak of it as a "fact." No party is prejudiced by assuming that what every one says — what all the witnesses agree upon — is true. 28 Iowa, 397, 404.

6. The instructions concerning the defendant's attempt to compound the offense, were fair and very liberal toward the defendant. The court might well have used stronger language, and advised the jury that the attempt to escape, and to buy off the prosecution, raised a strong presumption or inference of defendant's guilt. (15 Mich. 397; 14 Mo. 386; 47 N. H. 113.) As to the instruction asked concerning the prosecuting witness, the record is in no condition for the court to determine anything about it. This court does not know, except by the verification of the information, who the prosecuting witness was. This court does not know from the record whether Joseph M. Barney, the person who verified the information, was sworn or examined as a witness on the trial of the case or not. If the prosecuting witness was not sworn or examined on the trial, the instruction asked, of course, was inapplicable.

7. The defendant's 3d instruction was not applicable to any evidence in the case; and besides, to merely read it shows its fallacy. If a girl under the age of eighteen years is intrusted by her parents to the care and protection of two guardians, as frequently happens, it certainly will not be claimed that simply because there are two guardians instead of one, that either or both of them may defile her.

8. Another ground of complaint seems to have arisen in this way: After the introduction of the testimony, the trial judge reduced to writing, signed and read his instructions to the jury. The instructions were in the hands of counsel for defendant during the argument, and were referred to and

commented upon by them. By some accident or inadvertence, which is not very definitely explained in the record, one or two pages of the instructions became misplaced, and were by the judge placed in a drawer of the table, where they remained until the defendant's bill of exceptions was presented, when their omission was discovered, and they were resurrected and filed with the other instructions, and duly incorporated in the bill of exceptions. It does not appear that the defendant was prejudiced by this irregularity; and substantial justice having been done in the case, and no substantial error appearing, the judgment should not be disturbed.

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution under section 233 of the crimes-and-punishments act; (Gen. Stat. 369.) The defendant was charged with defiling one Emily Barney, a female person under eighteen years of age, by carnally knowing her while she was confided to his care and protection by her parents. The girl Emily was a sister of the defendant's wife, and their father, Joseph M. Barney, was the prosecuting witness in the case. On the trial, the prosecution introduced in evidence a letter from the defendant to his wife. This was done under the permission of the court, but over the objections of the defendant. The defendant claimed that this letter was a confidential communication from himself to his wife, and therefore that it was not competent evidence against him. The admission of this letter in evidence is the first ruling of the court below of which the defendant now complains. For the purposes of this case, we shall assume that said letter was a confidential communication from the defendant to his wife; that it is what would ordinarily be called a privileged communication, and that it could not have been introduced in evidence in this case or in any other case, by either the husband or the wife, or against either of them, except with the consent of both, so long as the letter remained in the hands or under the control of either of them, or in the hands or under the control of any

agent or representative of either of them. We assume this however without desiring to express any opinion upon the subject. And with this assumption, was the said letter wrongfully introduced in evidence? We think not. It would seem that the letter was in the hands and custody of Joseph M. Barney, the prosecuting witness, at the time it was introduced in evidence. It had previously been sent through the post-office, and by mail, from the defendant to his wife. Barney received it from the post-office, properly directed to the defendant's wife. He delivered it to her, and she, after reading it, returned it to him, and he furnished it to the prosecution to be read in evidence as aforesaid. And there was no evidence tending to show that it was at that time in the custody or under the control of any other person except Joseph M. Barney and the prosecution. It does not appear that either the defendant or his wife had at that time any control over the letter. It is certainly true, that a communication between husband and wife is a privileged communication. But it is privileged only while it remains within their custody and control, or while it remains within the custody and control of their agents or representatives, and just so far as it remains within the custody and control of themselves or their agents or representatives. "A private conversation between husband and wife, who thought that no one overheard them, may be testified to by a concealed listener." *Commonwealth v. Griffin*, 110 Mass. 181. See also, *State v. Center*, 35 Vt. 378. This rule also applies as to confidential communications between attorney and client. *Hoy v. Morris*, 13 Gray, 519; *Goddard v. Gardner*, 28 Conn. 172; 1 Greenl. Ev., § 239a. With reference to confidential communications between attorney and client, Dr. Wharton uses the following language: "If a legal adviser permits his client's papers to pass out of his hands into those of strangers, or if such papers are in any way extracted from his custody, they may be put in evidence by the party by whom they are held, as against the client. So far has this been pushed, that it has been held that if an attorney permits a witness to see

such writings, such witness, not being a clerk of the attorney, or legal adviser of the client, may be called to give secondary evidence of the writings, due notice being first given to produce them on the trial." 1 Wharton's Evidence, § 586. See also, *Lloyd v. Mostyn*, 10 Meeson & Welsby, 478. Mr. Greenleaf uses the following language, (probably with reference to written evidence generally, but immediately following a section concerning "communications between husband and wife,") to-wit: "It may be mentioned in this place, that though papers and other subjects of evidence may have been *illegally taken* from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully; nor will it form an issue to determine that question." 1 Greenl. Ev., § 254a.

There is no statute in this state rendering said letter incompetent evidence in a case of this kind. The only statutes supposed to even look in that direction are the following:

*Criminal Code, Section 209:* "The provisions of the law in civil cases, relative to *compelling the attendance and testimony of witnesses*, their examination, the administration of oaths and affirmations, and proceedings for contempt to enforce the remedies and protect the rights of parties, shall extend to criminal cases, so far as they are in their nature applicable thereto, subject to the provisions contained in any statute." (Gen. Stat. 853.)

*Civil Code, Section 323:* "* * * In no case shall *either* (*the husband or wife*) *be permitted to testify* concerning any communication made by one to the other during the marriage, whether called while that relation subsisted, or afterward." (Laws of 1872, page 335.)

It will be seen that these statutes do not go to the extent of excluding said letter as evidence. While the civil code provides that neither the husband nor wife shall, as a witness, furnish evidence concerning confidential communications, yet it does not provide that others who may happen to be possessed of such communications shall not do so; and while the criminal code provides that the provisions of law

in civil cases relative to "compelling the attendance and testimony of witnesses," and "their examination," "shall extend to criminal cases," yet it does not provide that the provisions of law in civil cases relating to the *competency* of witnesses and the *competency of evidence* shall extend to criminal cases. (*The State v. Howard*, 19 Kas. 509, 510.) A certain territorial district judge, once, however, in the early days of Kansas, thought otherwise, and permitted a defendant who was charged in a criminal case with murder in the first degree to testify in his own behalf, simply because defendants in civil cases were then (as now) allowed to testify in their own behalf. But whether said district judge would have compelled the defendant in that case to testify against himself, and in favor of the prosecution, at the instance of the prosecution, simply because defendants in civil cases could at that time be compelled to testify against themselves and in favor of the adverse party, at the instance of the adverse party, is not known. The provision quoted from the criminal code is old. It was first enacted in 1855, (Laws of 1855, page 621, §16;) and was reënacted in 1859, (Laws of 1859, page 209, §188; Comp. Laws of 1862, page 264, §188;) and again reënacted in 1868, (Gen. Stat. page 853, §209.) And the law making defendants competent witnesses in civil cases, for and against themselves, was passed in Kansas more than twenty years ago. Under section 215 of the criminal code, as amended in 1871, (Laws of 1871, page 280, §1,) a wife is a competent witness in a criminal case against her husband, if she chooses to testify. *The State v. McCord*, 8 Kas. 232.

All the instructions given by the court below to the jury were in writing, but inadvertently the court failed for fifteen days to sign some of them, or to file them among the papers of the case. These instructions were given on April 12th, and immediately thereafter were placed by the judge in a private drawer of his in a table behind which he sat while the court was in session. These instructions remained in such drawer until April 27th, (which was the last day of the term of the court,) when they were taken out and copied into a

bill of exceptions in this case, which bill of exceptions has been brought to this court. The defendant now claims that the failure of the judge to file them with the papers in the case was a fatal error. We do not think that it was, however. The statute does not in terms, if it does at all, require that the judge should sign instructions given in criminal cases; and the failure of the judge for fifteen days to file them among the papers of the case was not under the circumstances of this case a fatal error. Of course it was error, but it was not fatal, for the reason that it did not in the least affect any substantial right of the defendant. At the time the defendant desired to have his bill of exceptions allowed, the instructions were produced, ready to be incorporated into his bill of exceptions, and were so incorporated therein, and ready to be filed with the papers in the case. And as they had been reduced to writing by the judge before they were given, and were afterward put into a safe place, there could be no question as to their being given in a proper manner, nor as to their identity. The statute applicable to this question reads as follows:

"The judge must charge the jury in writing, and the charge shall be filed among the papers of the cause." (Gen. Stat. 858, § 236.)

It is probably unnecessary for us to say anything further in this case; for, taking the record brought to this court, it really does not in any intelligent manner present any of the other questions desired to be presented by counsel for the defendant. The evidence probably proved that the defendant was guilty beyond all possible doubt; but still, as the evidence has not all been brought to this court, we cannot tell this to a certainty. The evidence however brought to this court comes near enough to proving this fact to require a strong case of mere technical error to authorize a reversal of the judgment of the court below. But no strong case, if any case, of technical error has been made out, further than we have already considered.

The record is defective in not showing many things con-

40 — 20 KAS.

cerning which the defendant desires to raise questions in this
court. We suppose that Joseph M. Barney was the prose-
cuting witness in the case, but the record does not show that
he was either examined or sworn as a witness in the case.
Emily Barney, the girl alleged to have been defiled, was
probably quite young, but what her age was, except that she
was under eighteen years, cannot be told from the record.
It is shown that the girl was confided to the care of the de-
fendant by her mother; but from anything appearing in the
record she may have also been confided to his care by her
father, and that portion of the charge complained of may
have been error against the state, if error at all, instead of
error against the defendant. But is it material, whether
she was confided to the defendant's care by the one, or the
other, or by both? We think it is shown that she was not
confided to the care of her brother and sisters, either sepa-
rately, or conjointly with the defendant; but as she was cer-
tainly confided to the care of the defendant, is it material
whether she was also confided to the care of some other per-
son, or not? She was certainly under the care of the defend-
ant, and the defendant alone, when he defiled her.

We think it is clearly shown that the defendant fled from
the country, and such fact probably was shown beyond all
possible doubt.

It would probably have been out of place under the cir-
cumstances of this case for the court to have instructed the
jury with reference to *attempts* to commit offenses similar to
the one charged in this case. It would not have been proper
under the evidence; and besides, the defendant did not ask
that any such instruction should be given.

The court gave proper and sufficient instructions with ref-
erence to the *place* where the offense must be proved to have
been committed. Besides, there was no question but that the
offense was proved to have been committed in Neosho county,
Kansas, just where it was charged to have been committed.

The judgment of the court below will be affirmed.

All the Justices concurring.