## McKIE *v.* THE STATE.

1. Communications between husband and wife are excluded from public policy; and are rendered incompetent evidence upon the trial of the wife for the homicide of the husband.
2. Letters written by the wife to the husband, found after his death by his administrator in his safety-deposit box in a bank, and taken therefrom by the administrator and produced by him in court and introduced against the wife upon her trial for the homicide of her husband, were improperly admitted.
3. Communications between client and attorney are excluded from public policy, and are incompetent as evidence against the client upon her trial for the homicide of her husband; and this is so whether such letters were voluntarily produced by the attorney to be used against the client, or were surreptitiously or otherwise taken from the possession of the attorney.
4. The ground of the motion complaining that the court erred in allowing counsel for the State, over the objection of movant, to ask a leading question of a witness for the State, does not show error.
5. The court did not err in admitting evidence of the good character of the deceased.
6. The requests for instructions were substantially covered in the general charge, and the grounds assigning error upon the refusal of these requests do not show error.

Criminal Law, 16 C. J. p. 921, n. 89, 91; p. 960, n. 72; p. 1019, n. 26; p. 1020, n. 38; p. 1030, n. 71; p. 1049, n. 82; p. 1050, n. 84; p. 1063, n. 85; p. 1136, n. 81; p. 1242, n. 51; p. 1243, n. 58; 17 C. J. p. 203, n. 87; p. 250, n. 13.

Homicide, 30 C. J. p. 173, n. 88; p. 371, n. 34.

Witnesses, 40 Cyc. p. 2353, n. 2, 4; p. 2357, n. 41; p. 2358, n. 48; p. 2360, n. 73, 74; p. 2361, n. 81; p. 2362, n. 82, 83; p. 2379, n. 12, 14; p. 2380, n. 17.

7. Error is assigned upon the following charge of the court: "So if this defendant shot her husband under the fears of a reasonable woman that some bodily harm was about to be done her, amounting to a felony—not a misdemeanor, and she really acted under the influence of those fears and not in a spirit of revenge, then she is justified, and a seeming necessity, when acted upon in good faith, is the equivalent of a real necessity." The criticism is that this charge was "wholly in the abstract, when it should have been illustrative of how to apply such law to the facts of the case, but this the court nowhere did in its general charge." This assignment of the motion is without merit.

8. Error is assigned upon the following excerpt from the charge: "I charge you, however, gentlemen of the jury, if there are any threats or menaces or contemptuous gestures proved in the case, you may consider these along with all the evidence, or them themselves, in determining whether or not when the defendant shot she shot under the fears of a reasonable person that some bodily harm was about to be done her, amounting to a felony, and whether or not she shot under the influence of those fears and not in a spirit of revenge." The criticism is that "the use of the words, 'or contemptuous gestures proved,' made it necessary for the jury to find that such had been proved by the testimony of witnesses, when as a matter of fact there was no witness's testimony in the record which tended to prove such, but such did appear from the defendant's statement." The court charged the jury that they had the legal right to believe the statement of the accused in preference to the sworn testimony in the case. The excerpt, considered in connection with the charge as a whole was not erroneous. *Vaughn* v. *State*, 88 *Ga.* 731 (16 S. E. 64); *Lucas* v. *State*, 146 *Ga.* 315, at p. 331 (91 S. E. 72); *Stanford* v. *State*, 153 *Ga.* 219, at p. 235 (112 S. E. 130).

9. Error is assigned upon the following charge: "I charge you, gentlemen of the jury, that the prisoner has the right to make to the court and jury such statement as she deems proper in her own defense. It is not under oath, and you may believe it in preference to the sworn testimony in the case. I charge you, gentlemen of the jury, that it is the duty of the jury to take the law from the court, not from lawyers." The criticism of this charge is that it "was tantamount to instructing the jury to disregard any argument which counsel for movant had made upon the law touching her right to make a statement and the weight which the jury might give the same. Especially was said charge harmful error against her, when movant had introduced no evidence but relied wholly upon her statement as a defense, and especially when movant's counsel was the only lawyer who read any law to the jury during his argument touching the right of the defendant to make a statement and the weight the jury might give the same," counsel having read from a decision of this court. The charge states a correct abstract principle of law, and is not erroneous.

10. Two grounds of the motion complain that two jurors who participated in the trial were not impartial, alleging that such fact was not discovered by the accused or her counsel until after the verdict. Affidavits supporting this ground were attached; also affidavits from movant and

her counsel that the alleged facts were unknown until after the verdict. Counter-affidavits of the jurors themselves and of other persons testifying to their character were submitted. *Held*, that on the conflicting evidence the court did not abuse his discretion in finding that the jurors were impartial. *Hall* v. *State*, 124 *Ga.* 649 (52 S. E. 891); *McCrimmon* v. *State*, 126 *Ga.* 560 ·(55 S. E. 481); *McLeod* v. *State*, 128 *Ga.* 17 (57 S. E. 83); *Hall* v. *State*, 141 *Ga.* 7, at p. 9 (80 S. E. 307), and cit.; *Coggeshall* v. *Park*, 162 *Ga.* 78 (3) (132 S. E. 632).

11. As we grant a new trial, we do not pass upon the weight or character of the evidence.

No. 5920. NOVEMBER 19, 1927.

Murder. Before Judge Franklin. Richmond superior court. February 23, 1927.

*Pierce Brothers,* for plaintiff in error.

*George M. Napier, attorney-general, George Hains, solicitor-general, T. R. Gress, assistant attorney-general, John M. Graham, Callaway & Howard,* and *Hammond & Kennedy,* contra.

HINES, J. The defendant was tried and convicted of the offense of murder, and the State's evidence made the following case: The deceased and the defendant were husband and wife. They had been for some time estranged. For some reason the deceased had parked his car in a street in the City of Augusta, and had left it. The defendant, who was looking for the deceased, found the car and awaited the return of her husband. She stood around for a while, and then entered a church across the street from the car, sitting within the vestibule from which she could observe the surroundings, but in which she could not be seen. On observing her husband return to his car, she left the church, hastened across the street, approached the car in which her husband was seated at the steering-wheel, drew a pistol and fired upon him, from which shot he died soon afterwards in a hospital. According to the State's evidence, the jury were authorized to find that there was no conversation or demonstration between the two after the defendant reached the car and until after the husband was shot. Search after the shooting revealed that the deceased was unarmed. The defendant introduced no evidence but made a very lengthy statement, beginning with her birth and marriage in a distant State, and telling of continuous disagreements thereafter; of extreme cruel treatment of her by the husband, which had existed almost continuously since the marriage, all tending to show that he was immoral, profligate, shiftless, insensible to the duties of husband and father, preferring the association of the low and

immoral, turning a deaf ear to the wife's cries for aid for herself and small children in times of great need, and trickery and fraud upon his part in endeavoring to gain exclusive possession and control of his own property by pretending to be effecting a reconciliation; of a written contract signed by both of them, which was intended as a means of dismissing proceedings at law against him by her, and failure on his part to live up thereto; and finally of the arrival of the wife with her children in Augusta and the meeting on the day of the homicide. She said the husband frequently threatened to kill her. She did not deny killing him. Her statement bases her defense as follows:

"I went up on the next block to see about some necessary supplies. In returning and while passing the loan shop on Jackson Street I noticed some pistols in the window. I thought I should have one for my protection. I bought one. I remembered on the trips back and forth in the bus when Junior and I were the only passengers, and I would have to be going back and forth often, and many times alone. In returning to my boarding-house on the corner of McIntosh and Greene, walking on out Jackson, I saw our car parked a little way from Jackson. It flashed into my mind that if I could see him and tell him about our sick child, my distressed condition, and talk to him, perhaps he could help me. I did so need his help. I had thought of going to Aiken to Mrs. Bishop's. The thought of having my child ill among strangers terrified me. I waited in the car a while. It was stifling hot, the windows only open down half way. The car was—I don't know what you call it—a California top, or whatever it is. Anyway, the doors are about this wide, and the windows pass each other and they wouldn't let down any further than this [indicating], and then there is a little panel and then the rear door. It was so terribly warm in the car I walked up and down on the side, and finally stood in the doorway and then in the fruit stand on the corner, and finally going to the railway office, out of the heat. After waiting there some little time, I didn't know how long, I left. I noticed the church across the street. The door was open. I wondered if they were having noon services, as they do in so many of the cities where the churches are close to the business center and where business and professional people can stop in for a few minutes. Upon finding that this was

not the case I sat down to rest and wait. I forgot to mention it, but the pistol that I had bought was in my purse. Finally I saw Mr. McKie going toward his car. I went over there. He was about to start. I said: 'Honey, please wait. I want to talk to you. Junior is very sick.' He said: 'Didn't I tell you if you ever came to me again I would kill you?' He took his right hand off the steering-wheel this way and reached. I thought he was reaching for his pistol. I shot. I shot because he said he would kill me and reached for his gun, and in that instant I thought he intended to do it. Oh, if he had only listened to me and cared for our children, this horrible affair would never have happened. If he had listened that morning, but he wouldn't. Instead, he said he would kill me and reached for his gun, and as he did I raised my arm and the pistol fired; and I remember nothing more. The coming of my children has been the cause of it all. My husband would not provide for them when they were sick and needed attention. I had no means of my own."

The only reference in the record to the manner in which the letters from the wife to the husband were produced on the trial is found in the testimony of W. H. McKie, a witness for the State, who testified as follows: "I qualified as temporary administrator of this estate while this case is in progress to-day. I haven't qualified up until to-day. I qualified in compliance with the bank's requirement, to get some of the testimony that is being introduced here. It was in order to get some of the letters. The bank declined to recognize the request of the judge or anybody else to get in the bank box, unless some proceedings along that line were taken. I was appointed temporary administrator in order to get this information, and I got this out of the bank box" (indicating the receipt given by Mrs. McKie to her husband, exhibit No. 8). The State in rebuttal introduced several witnesses who testified to the good character of the deceased, and one who testified that he had spent much time with the couple, and that the deceased had always treated the wife properly and with consideration. The defendant moved for a new trial on the general grounds, subsequently amending the motion by adding twenty-three special grounds. The motion was overruled, and she excepted.

1. None of the rulings set out in the headnotes require elabora-

tion, except those dealt with in the first, second, and third head-notes. "There are certain admissions and communications ex-cluded from public policy. Among these are—1. Communica-tions between husband and wife. 2. Between attorney or counsel and client." Civil Code (1910), § 5785. It will be seen by examination that this section falls under chap. 2, art. 3 of the Code, which treats "Of rules governing the admission of testi-mony." This fact is important to be borne in mind in constru-ing this section. It has nothing to do directly with the com-petency of witnesses. The competency of husband and wife to testify for or against each other, and of an attorney to testify against his client, is fixed by section 1037 of the Penal Code. This section is found under art. 20, which deals with "Com-petency of Witnesses." Article 20 is found under the division which treats of criminal cases, "From the call of the docket to sentence." On the admissibility of communications between hus-band and wife, the courts and text-writers have laid down two conflicting rules. In 28 Ruling Case Law, 530, § 119, one of these rules is stated as follows: "In the view of many courts, the inhibition is as to the husband or wife, and not to a third person; and if the communication is in writing, and is procured by a third person without the consent or privity of either spouse, the reason for the exclusion of communications at common law no longer exists. The fact that the letter may have been illegally intercepted or illegally obtained will not operate to exclude it on the ground that it is a privileged communication. The court can not take notice of the manner in which possession of the letter was obtained." To support this rule the following cases are cited: Hammons v. State, 73 Ark. 495 (84 S. W. 718, 68 L. R. A. 234, 108 Am. St. R. 66, 3 Ann. Cas. 912); State v. Buffington, 20 Kan. 599 (27 Am. R. 193); O'Toole v. Ohio Ger-man F. Ins. Co., 159 Mich. 187 (123 N. W. 795, 24 L. R. A. (N. S.) 802); People v. Dunnigan, 163 Mich. 349 (128 N. W. 180, 31 L. R. A. (N. S.) 940); State v. Wallace, 162 N. C. 622 (78 S. E. 1, Ann. Cas. 1915B, 423); State v. Mathers, 64 Vt. 101 (23 Atl. 590, 15 L. R. A. 268, 33 Am. St. R. 921). In the case first cited, a husband in jail gave to a messenger a letter for his wife. The messenger handed it to a relative of the in-jured party, and it was held admissible. In that case there were

two dissents.    In State v. Buffington, there was no statute of Kansas making communications between husband and wife incompetent as evidence; and the court was dealing with a statute which rendered husband and wife incompetent to testify concerning any communications made by one to the other during marriage. In O'Toole v. Ohio German F. Ins. Co., letters written by a woman charged with burning her property to collect insurance, to her husband, which were lost by him and came into the possession of strangers, were admitted in evidence against her.   The Supreme Court of Michigan was dealing with a statute which declared that neither husband nor wife should "during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage," and cited in support of its ruling, State v. Mathers, supra; State v. Hoyt, 47 Conn. 518 (36 Am. R. 89) ; Gannon v. People, 127 Ill. 507 (21 N. E. 525, 11 Am. St. R. 147) ; State v. Buffington, supra; Com. v. Griffin, 110 Mass. 181; Geiger v. State, 6 Neb. 545; State v. Falsetta, 43 Wash. 159 (86 Pac. 168, 10 Ann. Cas. 177, 179) ; 1 Gr. Ev. (15th ed.) §§ 254, 254a; 4 Wig. Ev. §§ 2332-2341.

In People v. Dunnigan, the Supreme Court of Michigan held, that "The use as evidence against accused of a letter written by him to his wife, but intercepted by the authorities before it reached her possession, is not prevented by a statute prohibiting either husband or wife to be examined as to any communication made by one to the other."   In State v. Wallace, the Supreme Court of North Carolina held, that in a prosecution of a husband for theft, a letter written by the husband to his wife when presented by a third person is admissible, and is not objectionable as a confidential communication between husband and wife.   In that case the court dealt with the common-law rule that the law refuses to permit either husband or wife to be interrogated as to what occurred in their confidential intercourse during their marital relations, and cited Whar. Cr. Ev. § 398, which states that "A letter, also, written confidentially by husband to wife is admissible against the husband, when brought into court by a third party." In State v. Mathers, the Supreme Court of Vermont held:   "When papers are offered in evidence, the court can take no notice of how they were obtained, whether legally or illegally, properly or im-

properly, nor will it form a collateral issue to try that question. Hence, if a prisoner writes a letter to his wife and intrusts it to his daughter for delivery, and another daughter secures possession of it and produces it at his trial, it is admissible in evidence against him." In support of this doctrine the court cited 1 Greenleaf on Evidence, § 254a; 1 Wharton on Evidence, § 586; State v. Buffington, supra. In 23 Am. & Eng. Enc. Law (2d ed.), 97, it is said: "Notwithstanding the rule that letters between husband and wife are privileged, it has been repeatedly held that where such a letter has come into the hands of a third person it may be produced in evidence; but there are, on the other hand, a number of cases in which this has been denied." In support of the first proposition embraced in this extract, this work cites, in addition to State v. Buffington, and State v. Mathers, supra, the following cases: State v. Hoyt, supra; State v. Ulrich, 110 Mo. 350 (19 S. W. 656); People v. Hayes, 140 N. Y. 484 (35 N. E. 951, 23 L. R. A. 830, 37 Am. St. R. 572); Hanley v. State, 5 Ohio Cir. Dec. 488, 12 Ohio Cir. Ct. 584. In State v. Hoyt, there was no statute declaring evidence of communications between husband and wife incompetent, and the court put its decision upon 1 Greenleaf on Evidence, § 254a, 1 Bishop's Criminal Procedure, § 1115, and Com. v. Griffin, 110 Mass. 181; the latter decision holding that a conversation between a wife and her husband, overheard by a witness in an adjoining room, was not such a confidential communication as the law excludes from evidence. In State v. Ulrich, the letters were brought into court by the wife, and they were held inadmissible. It was stated that the writer believed that no case could be found where letters of husband or wife had been admitted against the other, unless brought into court by a third party; and the cases of State v. Buffington, and State v. Hoyt, Wharton on Criminal Evidence, § 398, and Greenleaf on Evidence, § 250a, were cited to support this statement. In People v. Hayes, it was held that where a husband wilfully gave to a third person letters received from his wife, they were released from the privilege, and could be used against him to the same extent as if the rule of privilege did not exist.

There are other cases which sustain the proposition that letters from one of a married pair to the other, which come into the possession of a third party, may, when not obtained directly from

the addressee, his agent or representative, be admitted against the writer of the letter. In People v. Swaile, 12 Cal. App. 192 (107 Pac. 134), a letter sent by the accused to his wife through a police officer was read by the wife and given back to the officer at his request, and by him was brought into court. It was admitted over the objection that it was a privileged communication. In State v. Morgan, 147 La. 205 (84 So. 589), a letter of the husband was mailed to the wife, opened and read by her, and then delivered by her voluntarily to the sheriff. It was admitted against the husband on his trial for murder. In Geiger v. State, 6 Neb. 545, 549, the letter of a husband to his wife, and found by a third person in the husband's hands was admitted against him. It was held that the court would not take notice how the letter was obtained. In Connella v. Territory, 16 Okla. 365 (86 Pac. 72), a letter was sent by the husband to his wife. It did not reach her, but fell into the sheriff's possession. It was admitted. In Com. v. Smith, 270 Pa. 583 (113 Atl. 844), the husband in jail wrote a letter to his wife, who was locked in another room thereof. The husband handed the letter to a fellow-prisoner for delivery to his wife, but it never reached her. It was admitted upon the ground that it had never reached her. In State v. Sysinger, 25 S. D. 110 (125 N. W. 879, Ann. Cas. 1912B, 997), letters written by a husband to his wife, and by her delivered to the prosecuting attorney, were admitted. In State v. Nelson, 39 Wash. 221 (81 Pac. 721), a wife's letter to her husband was offered and admitted to impeach her when sworn as a witness for a defendant who was charged with having committed adultery with her. It was admitted because it was produced by the officers of the State. Wigmore states the rule thus: "For documents of communication coming into the possession of a third person, a distinction should obtain, analogous to that already indicated for a client's communications (ante, §§ 2325, 2326); i. e., if they were obtained from the addressee by voluntary delivery, they should still be privileged (for otherwise the privilege could by collusion be practically nullified for written communications); but if they were obtained surreptitiously, or otherwise without the addressee's consent, the privilege should cease." 5 Wigmore on Evidence (2d ed.), § 2239 (2). This distinction does not seem to be based upon sound reasoning. If the privilege can not be

destroyed by collusion between a spouse and a third party, it should not be permitted to be destroyed by some one surreptitiously and wrongfully obtaining letters from the possession of the spouse to whom they were written. The purpose of the law in excluding communications between husband and wife is to produce perfect trust and confidence between them, which can not be secured if the communications can be disclosed either by the party to whom they were made or by third parties who surreptitiously or otherwise obtain the letters containing them from the spouse to whom they were addressed.

But the principle announced in the cases which we have been considering does not prevail in this State. It is conceded by the courts and text-writers that the decisions are in conflict as to the true rule to be observed in this matter. There are decisions from other courts which hold that letters from a husband to his wife, or from her to him, are inherently and absolutely privileged communications, and are not admissible in evidence for or against the husband or wife, no matter in whose hands they may be. Liggett v. Glenn, 51 Fed. 381; Bowman v. Patrick, 32 Fed. 368; Scott v. Com., 94 Ky. 511 (23 S. W. 219, 42 Am. St. R. 371) ; Reg. v. Pamenter, 12 Cox's C. C. 177; Dreier v. Continental Life Insurance Co., 24 Fed. 670; Mahner v. Linck, 70 Mo. App. 380; Mitchell v. Mitchell, 80 Tex. 101 (15 S. W. 705) ; Selden v. State, 74 Wis. 271 (42 N. W. 218, 17 Am. St. R. 144) ; Mercer v. State, 40 Fla. 216 (24 So. 154, 74 Am. St. R. 135). The principle announced in the cases just cited seems to be the better rule; and it has been virtually adopted in this State. It has been held that where a wife's administrator found among her papers letters from her husband, such administrator, by delivering them to an opposing litigant, in a spirit hostile to the husband, could not render them admissible against him. Bowman v. Patrick, 32 Fed. 368. The evidence in the record, when fairly construed without quibbling, discloses the fact that the letters from the defendant to her husband, which were introduced in evidence against her, were found in the safety-deposit box of the deceased husband by his administrator, and were brought into court by him to be used by the State against the wife. In Lingo v. State, 29 Ga. 470, it was held that "Communications between husband and wife are protected from disclosure, even after the

relation has ceased." In delivering the opinion in that case Judge Stephens said: "The husband was dead, and so it is true that the relation had ceased when the testimony was offered; but communications between husband and wife are protected *forever*. This is necessary to the preservation of that perfect confidence and trust which should characterize and bless the relation of man and wife. Each must feel that the other is a safe and sacred depository of all secrets. And the protection which the law holds over the dead is the very source of greatest security to all the living." In *Neal* v. *Patten*, 47 *Ga.* 73, it was held that "A solicitor of an executor can not be compelled to produce the sworn answer of such executor (who has died since the answer was made) to a bill in chancery, which answer has never been filed, and which was left with such solicitor to file or not, as he thought best, when the administrator de bonis non cum testamento annexo objects. It comes within the rule applicable to confidential communications." In *Wilkerson* v. *State*, 91 *Ga.* 729 (17 S. E. 990, 44 Am. St. R. 63), it was held that "Under section 3797 of the Code [of 1882; Civil Code of 1910, § 5785], which declares that from public policy communications between husband and wife are excluded as evidence, a letter written by the husband to the wife and received by her, which indicates the state of his feelings toward a third person and toward herself in relation to that person, is not admissible in evidence in behalf of such third person on his trial for the homicide of the husband, although the wife voluntarily parted with the possession of the letter by turning it over to the accused before the homicide and the latter has had possession and control of it ever since." As was said in that case, the law will not permit a party to whom a confidential communication is made, directly or indirectly to violate the confidence reposed.

After a most thorough examination of the authorities, no decision has been found which holds, under a statute which makes all communications between husband and wife, or attorney and client, incompetent evidence, that letters from one of the married pair to the other, which contain such communications, are admissible in a legal proceeding against the party by whom such letters were written. Our statute makes such evidence incompetent and inadmissible. It does not simply proscribe the channel through

which the evidence reaches the jury, but it makes the evidence itself inadmissible. In such circumstances we think that the letters written by the wife in this case to her husband, and those written by her to her attorney, were inadmissible under this statute; and that the trial judge erred in admitting them in evidence. This ruling does not conflict with the decisions of this court which hold that a party who hears an oral communication between a husband and wife can testify touching such communication. *Knight* v. *State,* 114 *Ga.* 49 (39 S. E. 928, 88 Am. St. R. 17); *Nunn* v. *State,* 143 *Ga.* 451 (85 S. E. 346); *Marcus* v. *State,* 149 *Ga.* 209 (99 S. E. 614); *Cocroft* v. *Cocroft,* 158 *Ga.* 714 (124 S. E. 346), and similar cases. Nor is the position which we take contrary to the rulings made by this court to the effect that courts will not generally concern themselves with the manner in which evidence is procured, if the evidence is otherwise admissible. *Williams* v. *State,* 100 *Ga.* 511 (28 S. E. 624, 39 L. R. A. 269); *Sanders* v. *State,* 113 *Ga.* 267 (38 S. E. 841); *Calhoun* v. *State,* 144 *Ga.* 679 (87 S. E. 893); *Johnson* v. *State,* 152 Ga. 271 (109 S. E. 662). In these and similar cases the evidence was competent and admissible; and this court held that such evidence was admissible although improperly or illegally obtained from the persons against whom it was introduced. In the case at bar the letters of the wife which were introduced against her on her trial for murder, suffered from the infirmity of incompetency. So the introduction of the letters from the wife to her husband, and from her to her attorney, were inadmissible. upon the ground that our law makes such evidence incompetent, as well as it makes the wife or husband incompetent to testify against the other. It is urged by counsel for the State that if the admission of this evidence is held to have been erroneous, a new trial should not be granted under the facts of this case. This contention has given the writer considerable trouble; but in view of the importance of preserving inviolate the principle which renders privileged communications between husband and wife, and especially those between attorney and client, a new trial should be granted. There are statements in these letters which might seriously prejudice the case of the defendant in the eyes of a jury drawn from the section in which this case was tried. So it seems to us that it is best to grant a new trial,

and allow a jury to pass on this case without consideration of these illegally admitted letters.

*Judgment reversed. All the Justices concur, except Hill and Gilbert, JJ., who dissent.*

GILBERT, J. While a portion of the evidence as to how the letters were obtained, standing alone, would justify the contention of movant, another portion would tend to prove the contrary. Taken all together, the court was authorized to hold that the temporary administrator qualified "to get some of the testimony that is being introduced here; it was in order to get some of the letters;" that his intention was not fulfilled, but that what he actually got from the box was "the receipt given by Mrs. McKie to her husband—Exhibit No. 8." We should not hold, under the facts, that the court erred in admitting letters written by her, on the ground that they were obtained from the temporary administrator, and that this was equivalent to obtaining them from the husband. Among outside authorities, there are decisions both pro and con as to whether a court will take notice of the manner in which possession of the letter was obtained. 28 R. C. L. 530 note 1, 531 note 2. This court has repeatedly held, and so far as I am aware practically all the courts hold, that statutes similar to § 5785 of our Civil Code were not intended to forbid one who overhears a conversation between husband and wife to testify with respect to the same. *Knight* v. *State,* 114 *Ga.* 48 (supra); *Ford* v. *State,* 124 *Ga.* 793 (53 S. E. 335); *Nunn* v. *State,* 143 *Ga.* 451 (supra); *Swain* v. *State,* 149 *Ga.* 629 (101 S. E. 539); *Hudson* v. *State,* 153 *Ga.* 695 (113 S. E. 519); *Reece* v. *State,* 155 *Ga.* 350, at p. 358 (116 S. E. 631); *Cocroft* v. *Cocroft,* 158 *Ga.* 714 (supra). In *Knight* v. *State,* the court said: "The meaning of this provision simply is that neither of the married pair will be permitted to testify as a witness concerning such communications, or to furnish to another, for the purpose of being introduced in evidence, writings of any kind received under the seal of confidence during coverture. This section of our Code was not intended to forbid one who overhears a conversation between husband and wife from testifying with respect to the same. If they are unsuccessful in keeping secret that which they intend each other shall so regard, the mere fact that they did so intend will not render incompetent the testimony of an outsider." If

oral statements of one spouse to another are thus admissible, does the same rule apply to writings? From what has been said it follows that any third person who may have heard the wife say things such as are contained in the letters would be a competent witness on the subject.

Are the letters admissible, or are they barred by the statute on the ground that they are privileged? Certainly statements reduced to writing are more dependable as to accuracy than those depending upon hearing and memory. Introducing the letters is no more the introduction of the writer as a witness than would be the allowing of a third person to take the stand and repeat what he had heard as he understood and remembered it. The object of the statute is to insure complete freedom from apprehension in the mind as to communication between spouses. Where either husband or wife destroys the privilege of protection from disclosure, such party can not complain if his or her communications are likewise disclosed. In *McCord* v. *McCord,* 140 *Ga.* 170, 176 (78 S. E. 833), where the wife was suing for divorce and had testified to conduct of the husband in which she claimed he deserted her, this court said: "Consequently, in the light of the pleadings in the case and the basis of her suit, the wife was virtually testifying that the husband remained away from her without her consent, and thus practically brought into the case herself the question as to whether she had communicated to him a desire that he should remain away or a consent that he should remain away. She thus removed the veil that protects from the public gaze the privacy of the married life and shields communications from the wife to the husband from judicial inquisition. She herself destroyed her own privilege of protection from a disclosure of her communications to her husband. And having destroyed that privilege for the purpose of making out her own case, she could not have it restored and upheld for the purpose of maintaining the fabric, when it was proposed to subject it to a perfectly proper test instituted for the purpose of ascertaining whether that fabric rested on a solid foundation. The foundation of her case was desertion. The test of the solidity and strength of that foundation was whether that seeming desertion was actual desertion; that is, willful desertion by the husband without cause and without consent of the spouse claiming to have

been deserted. If the husband stayed away from the wife in obedience to and in compliance with her wish that he should stay away—that he should make no efforts to see her, surely she could not charge that he was guilty of desertion, whatever other grounds she may have had for complaint against him. And the wife's letter which was offered and introduced in evidence in this case, unless explained itself, certainly explains the husband's conduct in remaining away from her." The defendant in her statement to the jury laid bare substantially everything contained in her letters.

Some portions of the wife's letters to the husband were undoubtedly irrelevant. The objection, however, was to the letters as a whole. The duty of the objector is to point out the irrelevant portions. "Mere irrelevancy is not sufficient to upset a verdict. Such evidence cumbers the record, sheds no light, gives no assistance, and prima facie is calculated to do no harm. If it does, the motion should disclose how it worked such a result." *Brown* v. *State,* 119 *Ga.* 572, 574 (46 S. E. 833), and cit. The motion undertakes to make such showing, but as to the letters to the husband the effort fails. The letters disclose only the same general tense and unfriendly relations between the parties as the accused had already shown in her statement. They contain other matter showing very great determination on the part of the wife not to agree upon a reconciliation except upon her own terms evidenced by a written contract showing a humiliating surrender by the husband. Her letters to the husband, after her statement to the jury, were admissible, not only to explain but to contradict portions of the statement. Her statement was a thorough waiver by her of her privilege to have their conjugal and marital relations remain confidential. Nothing contrary to what is above ruled is said in *Wilkerson* v. *State,* 91 *Ga.* 729 (supra), in *Southern Railway Co.* v. *White,* 108 *Ga.* 201 (33 S. E. 952), or in any other decision of this court. The decisions of other courts show a wide variety of views, and are conflicting. They are based upon varying statutes and facts. None are binding upon us, though I have carefully considered those named in the briefs as well as other cases and law publications.

Was there error in admitting the letters to the attorney? The Civil Code (1910), § 5786, declares: "Communications to any

attorney, or his clerk, to be transmitted to the attorney pending his employment, or in anticipation thereof, shall never be heard by the court. So the attorney can not disclose the advice or counsel he may give his client, nor produce or deliver up title-deeds or other papers, except evidences of debt left in his possession by his client. This rule does not exclude the attorney as a witness to any facts which may transpire in connection with his employment." In *Stone* v. *Minter,* 111 *Ga.* 45, at p. 49 (36 S. E. 321, 50 L. R. A. 356), this court declared "that the rule was not founded on any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, but out of regard to the interests of justice which could not be upheld, and to the administration of justice which could not go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in matters affecting rights and obligations which form the subject of judicial proceeding; and that if such communications were not protected, no man could consult a professional adviser with a view to his defense, nor safely go into a court either to obtain redress or to defend himself." The letters to the attorney were written for the purpose of employing him as associate counsel in a case for alimony pending in a South Carolina court against the husband. They were written about three months before the homicide. The attorney, in so far as the facts disclose, never replied, and was never employed. Two of the three letters show that the writer interpreted the attorney's silence as a declination of the proffered employment. None of the letters contain *any facts* with regard to the differences between husband and wife; there are no confidential facts stated with reference to their marital relations, and none with reference to any intended litigation except as above stated. One of the letters contains a slurring reference to the husband; but taken as a whole the letters, aside from seeking the services of the attorney, set out a lengthy eulogium of the writer's virtues and character, together with the high standing and reputation of her family and superior qualities and accomplishments of the people of her native section as compared with those of South Carolina. Accordingly, these letters appear quite irrelevant to the issue in the homicide case, unless it can be said that the slurring reference to the husband, as capable of

resorting to "unscrupulous" methods in the alimony case, was relevant as showing a vindictive spirit in the writer. It is probable that the letter making odious comparisons between the two sections of the country would not incline a jury to a favorable impression of the writer. It may have caused the contrary. Are we authorized to rule that the language mentioned rendered the letters material? I think not. Were the letters inadmissible under § 5786; that is, such as "shall never be heard by the court"? Accepting the statute on a literal construction, the answer would be against admissibility. But such rules of evidence have generally been construed to have reference to communications of facts regarding some business being transacted or in anticipation of transaction by the attorney for the client, the secrecy of which is necessary to the protection of the client's interests. Compare *Burnside* v. *Terry,* 51 *Ga.* 186 (2) ; *Stone* v. *Minter,* 111 *Ga.* at p. 50 (supra) ; *Fowler* v. *Sheridan,* 157 *Ga.* 271, 273 (121 S. E. 308). The statute was not intended to protect general comments, criticisms, and complaints having no reference to the merits of the litigation pending or in contemplation. So I do not think these letters fall within the inhibitions of the statute.

Finally, do these letters require a reversal on the ground that they were both irrelevant and harmful? As was said in *Travelers Ins. Co.* v. *Thornton,* 119 *Ga.* 455, at p. 457 (46 S. E. 678): "For it to produce such a result it should appear to have had a prejudicial effect on the minds of the jury. If such is the case, good practice would make it proper, if indeed it is not necessary, to point out how that which is alleged to have been irrelevant has become so far relevant as to have affected the verdict." In a close and doubtful case, the court might require another trial on the ground that some of the contents of the letters to the attorney had a prejudicial effect on the minds of the jury. But this case is not, on its facts, close and doubtful. The jury could not properly have returned a verdict of acquittal on the defense of justifiable homicide. No lower grade of homicide was involved. The jury properly exercised its right to recommend mercy, thus saving the accused from the extreme penalty. I am authorized to say that Mr. Justice Hill concurs in this dissent.